IN THE SUPREME COURT OF THE STATE OF KANSAS

No. 122,765

GOVERNOR LAURA KELLY,
in Her Official Capacity,
*Petitioner*,

v.

LEGISLATIVE COORDINATING COUNCIL,
KANSAS HOUSE OF REPRESENTATIVES, and
KANSAS SENATE,
*Respondents.*

SYLLABUS BY THE COURT

1.

The Kansas House of Representatives and Kansas Senate are dismissed from this action brought by the Governor to determine the authority of the Legislative Coordinating Council to act under House Concurrent Resolution 5025.

2.

House Concurrent Resolution 5025 does not authorize the Legislative Coordinating Council to revoke Executive Order 20-18. Its plain text requires, as a condition precedent to exercise any Legislative Coordinating Council power, action by the State Finance Council to permit extension of the time of the Governor's state of disaster emergency declaration.

3.

K.S.A. 46-1202 is a general statute creating the Legislative Coordinating Council and, in this instance, must give way to the more specific statute—K.S.A. 2019 Supp. 48-

1

925—which governs the revocation of gubernatorial executive orders issued during a declaration of state of disaster emergency.

Original action in quo warranto. Opinion filed April 11, 2020. Quo warranto granted in part.

*Clay Britton*, chief counsel, Office of the Governor, argued the cause, and *Lumen N. Mulligan*, of Lawrence, and *Pedro L. Irigonegaray*, of Irigonegaray, Turney, & Revenaugh, L.L.P., of Topeka, were with him on the brief for petitioner Governor Laura Kelly.

*Bradley J. Schlozman*, of Hinkle Law Firm LLC, of Wichita, argued the cause and was on the brief for respondents Legislative Coordinating Council and Kansas House of Representatives.

*Edward D. Greim*, of Graves Garrett LLC, of Kansas City, Missouri, argued the cause and was on the brief for respondent Kansas Senate.

PER CURIAM: This is an expedited original action in quo warranto brought by Governor Laura Kelly against the Legislative Coordinating Council, the Kansas House of Representatives, and the Kansas Senate. It broadly concerns statutory procedures for issuance of gubernatorial proclamations declaring a state disaster emergency and the legislative oversight authorized for such proclamations and their attendant executive orders under the Kansas Emergency Management Act (KEMA), K.S.A. 48-904 et seq.

This controversy arises in the wake of an emergency proclamation issued by Governor Kelly on March 12, 2020, in response to the global public health crisis related to the novel coronavirus (COVID-19) and her follow-up executive orders. The LCC purported to revoke one executive order. We are asked to determine whether it acted within its lawful authority. We hold that it did not.

2

As ultimately acknowledged by all counsel during oral arguments today, even if we accept House Concurrent Resolution 5025 as an otherwise valid exercise of legislative authority, its plain text did not authorize the LCC to revoke Executive Order 20-18. That acknowledgment ends this controversy.

We need not and do not decide the merits of other arguments advanced or attempted to be advanced by the parties—including whether a concurrent resolution passed by the Legislature can delegate its oversight authority under KEMA to the LCC; whether the statutes creating and enabling the LCC affect the KEMA analytical framework; whether due process is violated by the type of notice about the Governor's executive orders; or whether Executive Order 20-18 was a legally valid or constitutional exercise of the Governor's authority, despite its limitation on religious gatherings.

Also, before reciting the factual and procedural background necessary to our decision and discussing the merits of the dispositive legal issue, we note sua sponte that the House and Senate may not be properly named as parties to this quo warranto action. For the same reasons expressed in *State ex rel. Schmidt v. Kelly,* 309 Kan. 887, 891-93, 441 P.3d 67 (2019), we dismiss them from this case.

FACTUAL AND PROCEDURAL BACKGROUND

K.S.A. 48-924(b) grants the Governor a statutory power to declare a state of disaster emergency. The pertinent part of subsection (b) provides:

> "(1) The governor, upon finding that a disaster has occurred or that occurrence or the threat thereof is imminent, shall issue a proclamation declaring a state of disaster emergency.
>
> . . . .

3

"(3) The state of disaster emergency so declared shall continue until the governor finds that the threat or danger of disaster has passed, or the disaster has been dealt with to the extent that emergency conditions no longer exist. Upon making such findings the governor shall terminate the state of disaster emergency by proclamation, but except as provided in paragraph (4), *no state of disaster emergency may continue for longer than 15 days unless ratified by concurrent resolution of the legislature*, with the single exception that upon specific application by the governor to the state finance council and an affirmative vote of a majority of the legislative members thereof, a state of disaster emergency may be extended once for a specified period not to exceed 30 days beyond such 15-day period.

"(4) If the state of disaster emergency is proclaimed pursuant to paragraph (2), the governor shall terminate the state of disaster emergency by proclamation within 15 days, unless ratified by concurrent resolution of the legislature, except that when the legislature is not in session and upon specific application by the governor to the state finance council and an affirmative vote of a majority of the legislative members thereof, a state of disaster emergency may be extended for a specified period not to exceed 30 days. The state finance council may authorize additional extensions of the state of disaster emergency by a unanimous vote of the legislative members thereof for specified periods not to exceed 30 days each. Such state of disaster emergency shall be terminated on the 15th day of the next regular legislative session following the initial date of the state of disaster emergency unless ratified by concurrent resolution of the legislature.

"(5) At any time, the legislature by concurrent resolution may require the governor to terminate a state of disaster emergency. Upon such action by the legislature, the governor shall issue a proclamation terminating the state of disaster emergency." (Emphasis added.)

Under subsection (b)(1), the Governor proclaimed a state of disaster emergency on March 12. Under subsection (b)(3), the proclamation could not last longer than 15 days unless ratified by a concurrent resolution of the Legislature. Additional exceptions to that ratification timeline are not relevant to our discussion.

Once the proclamation is declared under K.S.A. 48-924, the Governor obtains powers set out in K.S.A. 2019 Supp. 48-925. That statute provides:

"(a) During any state of disaster emergency declared under K.S.A. 48-924, and amendments thereto, the governor shall be commander-in-chief of the organized and unorganized militia and of all other forces available for emergency duty. To the greatest extent practicable, the governor shall delegate or assign command authority by prior arrangement, embodied in appropriate executive orders or in rules and regulations of the adjutant general, but nothing herein shall restrict the authority of the governor to do so by orders issued at the time of a disaster.

"(b) Under the provisions of this act and for the implementation thereof, the governor may issue orders and proclamations which shall have the force and effect of law during the period of a state of disaster emergency declared under subsection (b) of K.S.A. 48-924, and amendments thereto, and which orders and proclamations shall be null and void thereafter unless ratified by concurrent resolution of the legislature. *Such orders and proclamations may be revoked at any time by concurrent resolution of the legislature*.

"(c) During a state of disaster emergency declared under K.S.A. 48-924, and amendments thereto, and in addition to any other powers conferred upon the governor by law, the governor may:

. . . .

(7) control ingress and egress of persons and animals to and from a disaster area, the movement of persons and animals within the area and the occupancy by persons and animals of premises therein; [and]

. . . .

5

(11) perform and exercise such other functions, powers and duties as are necessary to promote and secure the safety and protection of the civilian population.

"(d) The governor shall exercise the powers conferred by subsection (c) by issuance of orders under subsection (b). The adjutant general, subject to the direction of the governor, shall administer such orders." (Emphasis added.) K.S.A. 2019 Supp. 48-925.

Within the 15-day statutory window, the Legislature adopted House Concurrent Resolution (HCR) 5025 extending the Governor's declaration to May 1, 2020. The resolution reads:

"WHEREAS, On March 12, 2020, Governor Laura Kelly issued a State of Disaster Emergency declaration in response to confirmed cases of novel coronavirus (COVID-19) in the state of Kansas and considers that a public health emergency exists within the state of Kansas. The United States Centers for Disease Control and Prevention (CDC) identifies the potential public health threat posed by COVID-19 both globally and in the United States as 'high,' and the United States Department of Health & Human Services declared a public health emergency for COVID-19 beginning January 27, 2020. The World Health Organization (WHO) declared a global pandemic on March 11, 2020: Now, therefore,

"Be it resolved by the House of Representatives of the State of Kansas, the Senate concurring therein: That the State of Disaster Emergency declaration issued on March 12, 2020, for the entire 105 counties of Kansas in accordance with K.S.A. 48-924 is hereby ratified and continued in force and effect on and after March 12, 2020, through May 1, 2020, subject to additional extensions by concurrent resolution of the Legislature or as further provided in this concurrent resolution. If the Legislature is not in session:

"(1) As described in K.S.A. 48-924(b)(3), upon specific application by the Governor to the State Finance Council, the State Finance Council may authorize once an extension of such state of disaster emergency by affirmative vote of a majority of the legislative members thereof for a specified period not to exceed 30 days; and

"(2) following such State Finance Council action, the Legislative Coordinating Council, representing the Legislature when the Legislature is not in session pursuant to K.S.A. 46-1202:

(A) Is authorized to ratify a declaration, terminate a state of disaster emergency, revoke an order or proclamation or assume any other power granted to the legislature pursuant to K.S.A. 48-924 or K.S.A. 2019 Supp. 48-925;

(B) may authorize additional extensions of such state of disaster emergency by a majority vote of five members thereof for specified periods not to exceed 30 days each;

(C) shall meet not less than every 30 days to:

(i) Review the state of disaster emergency;

(ii) consider any orders or proclamations issued since the last Legislative Coordinating Council meeting; and

(iii) consider whether such orders or proclamations, if any, are an exercise of any power listed in K.S.A. 2019 Supp. 48-925(c)(2), (c)(4), (c)(7), (c)(8) or (c)(11); and

(D) shall have the authority to review and revoke all orders and proclamations issued by the governor pursuant to K.S.A. 2019 Supp. 48-925(b). The chairperson of the Legislative Coordinating Council, in consultation with the attorney general, adjutant general and any other parties the chairperson deems necessary, shall determine if an order or proclamation that is an exercise of a power listed in K.S.A. 2019 Supp. 48-925(c)(2), (c)(4), (c)(7), (c)(8) or (c)(11) has been issued. If the chairperson determines that the order or proclamation is an exercise of such power, the Legislative Coordinating Council

7

shall meet to consider such order or proclamation within three calendar days. At such meeting, the Legislative Coordinating Council may revoke such order or proclamation; and

"Be it further resolved: That, for the purposes of this ratification, the Governor shall not have the power or authority to temporarily or permanently seize, or authorize seizure of, any ammunition or to suspend or limit the sale, dispensing or transportation of firearms or ammunition pursuant to K.S.A. 2019 Supp. 48-925(c)(8) or any other executive authority."

On April 7, Governor Kelly used her K.S.A. 2019 Supp. 48-925(b) powers to issue Executive Order 20-18, relating to her March 12 emergency proclamation. Among other things, it temporarily prohibited, subject to several exemptions, "mass gatherings," defined as "any planned or spontaneous, public or private event[s] or convening[s] that will bring together or [are] likely to bring together more than 10 people in a confined or enclosed space at the same time." Executive Order 20-18 rescinded and replaced an earlier, substantially similar executive order. But Executive Order 20-18 differed in that it removed "[r]eligious gatherings" and "[f]uneral or memorial services or ceremonies" from the list of "activities or facilities" exempt from the temporary prohibition of mass gatherings.

On April 8, the LCC convened pursuant to HCR 5025. By 5-to-2 vote, it revoked Executive Order 20-18.

The next day, Governor Kelly filed this original action in quo warranto challenging the asserted revocation of her executive order. We agreed to expedite these proceedings due to the nature of the public health emergency all agree is present. We heard oral argument from counsel to the parties this morning.

8

Article III, section 3 of the Kansas Constitution grants the Supreme Court original jurisdiction over actions in quo warranto. *State ex rel. Stephan v. Kansas House of Representatives*, 236 Kan. 45, 52, 687 P.2d 622 (1984). Relief in quo warranto is discretionary. We may entertain the current proceeding if we determine the issue is of sufficient public concern. 236 Kan. at 53. Under the circumstances our state faces, we easily do.

An action in quo warranto demands that an individual or corporation show by what authority it has engaged in a challenged action. *State ex rel. Schmidt v. City of Wichita*, 303 Kan. 650, 656, 367 P.3d 282 (2016). K.S.A. 60-1202(1) provides an action in quo warranto may be brought in the Supreme Court "[w]hen any person shall usurp, intrude into or unlawfully hold or exercise any public office, or shall claim any franchise within this state, or any office in any corporation created by authority of this state." And K.S.A. 60-1202(5) allows such an action "[f]or any other cause for which a remedy might have been heretofore obtained by writ of quo warranto at common law." In this controversy, the Governor complains about the LCC's intrusion into the legislative scheme for overseeing her emergency authority in the face of the present public health crisis. We are convinced that a quo warranto action is an appropriate vehicle for questioning the LCC's authority to revoke Executive Order 20-18 under HCR 5025. See *City of Wichita*, 303 Kan. at 656.

*The House and the Senate's Capacity to Be Sued*

Neither the House nor the Senate argues it should be dismissed because it lacks capacity to be sued. Nevertheless, we recently observed that the legal question of whether the Legislature, or one house of the Legislature, can be sued remains unsettled. In *Kelly*,

9

309 Kan. at 891, the Kansas Senate was a respondent in an action brought by the State on relation of the attorney general. The Senate did not raise a capacity issue in that case, but the court dismissed it as a party, expressing hesitancy "'to establish as precedent at this time the validity of an action such as this by the attorney general on behalf of the state directly against the legislature.'" 309 Kan. at 892 (quoting *Kansas House of Representatives*, 236 Kan. at 58).

As with *Kelly* and *Kansas House of Representatives*, we again choose to dismiss these legislative bodies as parties to this action. Their presence is unnecessary to resolve the merits related to the LCC's authority, and we remain hesitant to establish any precedent. Our caselaw reflects the LCC has been a party to litigation previously in this court, so there is no new precedent in that regard. See, e.g., *Legislative Coordinating Council v. Stanley*, 264 Kan. 690, 957 P.2d 379 (1998).

*The Governor's Standing to Sue*

Broadly, standing exists when a party has suffered a cognizable injury and there is a causal relation between the injury and the conduct. *Board of Johnson County Comm'rs v. Jordan*, 303 Kan. 844, 854, 370 P.3d 1170 (2016) (county commissioners have standing in mandamus action against Kansas Department of Revenue). The Supreme Court has original jurisdiction in proceedings in quo warranto, mandamus, and habeas corpus. Kan. Const. art. 3, § 3. In cases brought under the court's original jurisdiction, the petitioner has standing when he or she demonstrates a need to secure speedy adjudication of questions of law for guidance of state officials. *Ambrosier v. Brownback*, 304 Kan. 907, 910, 375 P.3d 1007 (2016).

Further, K.S.A. 60-1203 governs standing to bring a quo warranto action as follows:

10

"Where the action is brought by a person claiming an interest . . . adverse to a resolution . . . which is the subject of the action, it shall be prosecuted in the name and under the direction of such person, otherwise it shall be prosecuted in the name of the state by the attorney general or county attorney."

We have no trouble ruling that the Governor has standing to challenge the LCC's attempt to revoke her executive order. She argues that both the LCC's exercise of power and the House Concurrent Resolution under which the LCC claims authority to act are contrary to K.S.A. 2019 Supp. 48-925 and unconstitutional under article II, sections 14 and 20 of the Kansas Constitution. Her argument squarely falls within K.S.A. 60-1202(1). She asserts an interest in the effectiveness of her disaster emergency powers that is adverse to the LCC's claimed authority to nullify her actions.

*Authority to Revoke Executive Order 20-18*

HCR 5025 answers the only question that demands an answer today. The Respondents claim that HCR 5025 allows the LCC to represent the Legislature when the Legislature is not in session. But they fail to consider its plain language, which establishes conditions precedent.

First, it provides for the Governor to apply to the State Finance Council for authorization for a one-time extension of a state of disaster emergency. That language in section 1 of the resolution parallels K.S.A. 48-924(b)(3). The resolution then states:

"(2) *following such State Finance Council action, the Legislative Coordinating Council, representing the Legislature when the Legislature is not in session pursuant to K.S.A. 46-1202:*

11

(A) Is authorized to ratify a declaration, terminate a state of disaster emergency, revoke an order or proclamation or assume any other power granted to the legislature pursuant to K.S.A. 48-924 or K.S.A. 2019 Supp. 48-925;

. . .

(D) shall have the authority to review and revoke all orders and proclamations issued by the governor pursuant to K.S.A. 2019 Supp. 48-925(b)." (Emphasis added.)

Nothing in the limited record before us nor any statement made at oral argument indicates the Governor has asked the State Finance Council for an extension of the state of disaster emergency. Nor do the record or counsel indicate the State Finance Council has acted upon such a request. During oral argument, Respondents' counsel conceded these conditions had not occurred.

The step involving the State Finance Council must occur before the LCC's now-challenged authority is triggered under HCR 5025(2). Subsection (2) begins with the words "following such State Finance Council action . . . ." Because the State Finance Council has not taken action, this circumstance does not exist and HCR 5025 does not grant the LCC the authority to revoke Executive Order 20-18. See *Stanley*, 264 Kan. at 706 (holding that the LCC "is an administrative agency created by statute. Its power and authority are defined by law" and "any exercise of authority claimed by the agency must come from within the statutes"); *Legislative Coordinating Council v. Frahm*, 262 Kan. 144, 149-50, 936 P.2d 267 (1997) (same).

Respondents also have argued that the Governor acquiesced and accepted this language as HCR 5025 was negotiated and that she did so as she encouraged the Legislature to adjourn. Even if we accept those factual assertions as true, principles of acquiescence do not somehow imbue the LCC with legal authority. We—and the LCC—

12

are bound by the plain language of the resolutions and bills adopted by the Legislature. *Nauheim v. City of Topeka*, 309 Kan. 145, 149-50, 432 P.3d 647 (2019). Courts avoid adding, deleting, or substituting words in statutes. *State v. Snellings*, 294 Kan. 149, 157, 273 P.3d 739 (2012).

Here, the plain language requires certain conditions—the State Finance Council must have acted upon the Governor's request for an extension of the emergency declaration—before the LCC can act on behalf of the Legislature. And no equitable principle can be used to alter that language.

*More Specific KEMA Provisions Control over General LCC Statute*

In a final effort to avoid the flaws we have identified in HCR 5025 and preserve its authority to act in this matter, the LCC suggests that it possesses the statutory authority to revoke Executive Order 20-18 wholly independent of HCR 5025. The LCC points us to its enabling statute, which grants it the "power to represent the legislature when the legislature is not in session." K.S.A. 46-1202. But K.S.A. 46-1202 is a general statute creating the LCC and in this instance must give way to the more specific statute—K.S.A. 2019 Supp. 48-925—which governs the revocation of gubernatorial executive orders issued during a state of disaster emergency declaration. *Merryfield v. Sullivan*, 301 Kan. 397, 398, 343 P.3d 515 (2015) ("It is a general rule of statutory interpretation that, when both a general statute and a specific statute govern the same topic, the specific statute controls."). We hold that if the LCC could possess the authority to revoke such an order—a question we expressly have declined to decide—such power would have to be consonant with the Legislature's action under KEMA, the specific, controlling statutory scheme.

13

CONCLUSION

The Court has considered and grants in part the Governor's Petition in Quo Warranto. The LCC's purported revocation of Executive Order 20-18 on April 8 was a nullity, because the LCC lacked authority do so under HCR 5025's terms. Because this resolves the present dispute, we do not reach broader questions concerning the asserted conflicts between HCR 5025 and K.S.A. 48-924 and 48-925.

MICHAEL E. WARD, Senior Judge, assigned.[1]

* * *

BILES, J., concurring: I agree with the outcome and rationale. I write separately to express my doubts about HCR 5025's ability to confer oversight powers on the LCC when the plain language of state law says otherwise. At its core, the dispute the parties ask us to resolve turns on a more substantive question: Even if all preconditions set out in the concurrent resolution were met, was the LCC lawfully empowered to disturb Executive Order 20-18? Plainly, the Kansas Emergency Management Act does not contemplate revision by concurrent resolution.

The LCC does not make even a colorable claim that its revocation of the Governor's emergency order was a "concurrent resolution of the legislature" as would be required under the statute. See Rules of the House, Rule 2707 (providing generally that majority of House members necessary to adopt House concurrent resolution). Indeed, the

---

[1]**REPORTER'S NOTE:** Senior Judge Ward was appointed to hear case No. 122,765, under the authority vested in the Supreme Court by K.S.A. 20-2616 to fill the vacancy on the court by the retirement of Chief Justice Lawton R. Nuss.

LCC carefully characterizes what it did as "exercis[ing] the power the [L]egislature reserved for itself to quickly review and, if necessary, check the [G]overnor's use of legislatively delegated authority."

As the majority notes, the LCC claims its authority to revoke the Governor's executive order through the awkwardly drafted terms of HCR 5025. Slip op. 11-12. But it is axiomatic that a legislative concurrent resolution cannot amend a statute. So how is the LCC's position even viable? Legislation becomes law when it is passed by majority votes of both houses of the Legislature and presented to the Governor, who must sign it or allow it to become law without signing it. Kan. Const. art. 2, §§ 13, 14. If the bill is vetoed by the Governor, it can still become law if that veto is overridden by two-thirds majorities in both houses. Kan. Const. art. 2, § 14(a).

There is no dispute K.S.A. 48-924 and K.S.A. 2019 Supp. 48-925 were duly enacted into law. Conversely, there is no dispute HCR 5025 was *not* duly enacted into law. That means the real question is whether LCC oversight had to be put into statute for the LCC to gain these powers. My answer would be, Yes. There is a lawful way of making that happen, and this is not it.

In *State ex rel. Stephan v. Kansas House of Representatives*, 236 Kan. 45, 46, 64, 687 P.2d 622 (1984), the court held the Legislature may not by concurrent resolution "adopt, modify or revoke administrative rules and regulations . . . without presentment to the governor." It reasoned that the mechanism would

> "violate[ ] not only the separation of powers doctrine but also the presentment
> requirement contained in art. 2, § 14 of our state constitution. As made clear by the court
> in [*I.N.S. v. Chadha*, 462 U.S. 919, 103 S. Ct. 2764, 77 L. Ed. 2d 317 (1983)], a
> resolution is essentially legislative where it affects the legal rights, duties and regulations

15

of persons outside the legislative branch and therefore must comply with the enactment provisions of the constitution. Where our legislature attempts to reject, modify or revoke administrative rules and regulations by concurrent resolution it is enacting legislation which must comply with the provisions of art. 2, § 14. A bill does not become a law until it has the final consideration of the house, senate and governor as required by art. 2, § 14. This was not done here. "[Citations omitted.]" 236 Kan. at 64.

This analysis should apply with equal force to the Legislature's bungled effort here to alter K.S.A. 2019 Supp. 48-925 through HCR 5025. And despite the LCC's claim that it was simply fulfilling on the Legislature's behalf that body's responsibilities under the disaster proclamation statutes, HCR 5025 tries to change the process.

KEMA assigns duties to the Governor, the Legislature, and the State Finance Council—with no mention of the LCC, and no provision for the LCC to act in the Legislature's stead. This is particularly notable since the Legislature made provisions in the law for another entity, the State Finance Council, to approve disaster emergency extensions when the Legislature is not in session. See K.S.A. 48-924(b)(3), (b)(4).

Obviously, by naming the State Finance Council for this purpose, the Legislature contemplated a need to delegate some authority under the Act when it is not in session. But just as plainly, it chose not to do that with respect to oversight of emergency orders. For those, it kept the full bodies of each legislative house in the approval loop. See *Nauheim v. City of Topeka*, 309 Kan. 145, 149-50, 432 P.3d 647 (2019) ("When the language is plain and unambiguous, the court must give effect to its express language, rather than determine what the law should be. The court will not speculate about legislative intent and will not read the statute to add something not readily found in it.").

The concurrent resolution's asserted conveyance of oversight power is legislative in nature. The change it attempts impacts the rights and duties of persons outside the

legislative branch: for one, the Governor. It did this by subjugating the Governor's disaster powers to repeated oversight by a body other than the ones specified by KEMA. What's more, the LCC acted on that authority in a manner that brings the alteration of rights and responsibilities into stark relief—with practical alterations to the rights and duties of persons outside the legislative branch. The LCC's implementation of HCR 5025 casts a cloud over the continuing validity of the Governor's emergency orders, and, consequently a cloud over the enforcement and compliance obligations of Kansas law enforcement officers and Kansans generally. And it did this at a critical time for our state—in the face of an incomprehensibly complex public health crisis.

As a result, for the Legislature to validly confer oversight authority to the LCC, bicameral adoption and presentment were required, i.e., the constitutional steps required for a bill to become a law. That simply did not happen here. And expediency is no excuse to circumvent legal process mandated by the people through our Constitution. If the law is antiquated and should be changed, change it. But HCR 5025 is not the way to amend statutes even if it had strong support in both houses.

There was no presentment as required by the Constitution to make a law. For that reason, HCR 5025 did not vest the power for the LCC to revoke an emergency order issued by the Governor under K.S.A. 2019 Supp. 48-925.

* * *

STEGALL, J., concurring: I concur with and fully join the majority opinion today in both rationale and result. I write separately to briefly address Justice Biles' separate opinion and to address a few points not emphasized in the majority opinion.

17

Justice Biles writes to suggest that even if HCR 5025 had effectively assigned to the LCC the authority to revoke EO 20-18, such action would still be unlawful. I do not take a position on that question as it is not necessary to resolve the case before us. But I do disagree with Justice Biles when he writes that the "LCC does not make even a colorable claim" that its action was a concurrent resolution of the Legislature in compliance with K.S.A. 2019 Supp. 48-925(b). Slip op. at 14 (Biles, J., concurring). Part of the LCC's argument is that its action was contemplated by—and incorporated into by assignment—HCR 5025 when the Legislature as a whole adopted it.

To me, this claim is at least colorable in light of the vexing separation of powers problems created when one branch of government delegates its power to another branch as the Legislature has done (in part) in KEMA. Absent a liberal interpretation of the Legislature's ability to continually oversee the Governor's exercise of delegated Legislative authority, the structure of KEMA itself risks violating the constitutional demand of separate powers. See *Solomon v. State*, 303 Kan. 512, 538, 364 P.3d 536 (2015) (Stegall, J., concurring) ("The separation of powers contains no opt-out clause. The departments are not free to ignore the strictures of separate powers upon a mutual declaration of cooperation in furtherance of some jointly agreed upon governmental objective.").

Next, given the extraordinary nature of this action and the heightened public attention it has drawn, I find it necessary to address one argument gestured at by the LCC but not actually joined. As the majority opinion explains, HCR 5025's plain text requires an act of the State Finance Council to trigger the ability of the LCC to exercise the power assigned to it by the Legislature as a whole. It is important to emphasize that at oral argument, the LCC conceded that this was the only possible reading of the plain language of HCR 5025.

18

Having conceded the textual ground of the battle, counsel for the LCC suggested at one point that the language in HCR 5025 did not accurately reflect the Legislature's intent and could be bypassed. In support of this argument, counsel pointed out that the entirety of HCR 5025(1)—along with the introductory phrase in HCR 5025(2)—can have no legal or practical effect and is therefore nonsensical.

Indeed, the LCC appears correct on this point. The statute referenced in HCR 5025(1)—K.S.A. 48-924(b)(3)—only authorizes the State Finance Counsel to extend a gubernatorial state of disaster emergency declaration 30 days beyond the initial 15-day period contemplated by KEMA. See K.S.A. 48-924(b)(3) ("[N]o state of disaster emergency may continue for longer than 15 days unless ratified by concurrent resolution of the legislature, with the single exception that upon specific application by the governor to the state finance council and an affirmative vote of a majority of the legislative members thereof, a state of disaster emergency may be extended once for a specified period not to exceed 30 days beyond such 15-day period."). Counsel points out that 45 days beyond the Governor's initial declaration will occur earlier than May 1, 2020—the date of the Legislature's already-adopted extension. So, it appears that under HCR 5025 the State Finance Council cannot extend the declaration past May 1 under any imaginable scenario.

Further, it appears K.S.A. 48-924(b)(3) operates only while the Legislature is in session. A different statute—K.S.A. 48-924(b)(4)—gives the State Finance Council broader power to extend a disaster declaration when the Legislature is out of session. See K.S.A. 48-924(b)(4) (providing that "*when the legislature is not in session* and upon specific application by the governor to the state finance council and an affirmative vote of a majority of the legislative members thereof, a state of disaster emergency may be extended for a specified period not to exceed 30 days" and further stating that the State Finance Council may then "authorize additional extensions of the state of disaster

emergency by a unanimous vote of the legislative members thereof for specified periods not to exceed 30 days each") (Emphasis added.). Again, the text of HCR 5025—suggesting that when the Legislature is out of session the State Finance Council could operate under a statute intended to apply only when the Legislature is in session—is self-contradictory.

All of this is enough to convince me that HCR 5025(1) and the introductory phrase of HCR 5025(2) are—as the LCC insists—at best a poor reflection of the Legislature's intent. Both the Governor and the LCC suggest that this court could therefore choose to side-step that portion of the Concurrent Resolution and rule directly on the question of whether the LCC could exercise any authority under HCR 5025(2)(A) and (2)(D). Giving the LCC the benefit of a good-faith rendition of the best version of their argument—as I think we must in this extraordinary and expedited action—the LCC essentially argues that a literal reading of HCR 5025 would produce absurd results.

Though not couched in our traditional statutory interpretation lingo, the LCC suggests:  (1) it is absurd for HCR 5025(1) to contemplate a meeting of the State Finance Council that is both legally impossible and practically impotent; (2) this absurdity renders HCR 5025 ambiguous as to whether the State Finance Council must act before the LCC can act; (3) this court should therefore look behind the plain language used by the Legislature to discern legislative intent; and (4) the Legislature intended the LCC to act in the manner that it has acted.

We have said before that we may depart from our strict adherence to the plain text of a law if that plain reading produces obviously absurd results. A court "must construe a statute to avoid inherently unreasonable or absurd results." *State v. Arnett*, 307 Kan. 648, 654, 413 P.3d 787 (2018). We presume "the legislature does not intend to enact useless or meaningless legislation. . . . Equally fundamental is the rule of statutory interpretation

20

that courts are to avoid absurd or unreasonable results." *State v. Frierson*, 298 Kan. 1005, 1013, 319 P.3d 515 (2014). "Additionally, when the meaning of a statute is not clear from its plain language, we may consider the provisions of the entire act with a view toward reconciling and bringing them into harmony if possible. . . . The court always strives for a reasonable interpretation or construction that avoids an unreasonable or absurd result." *Baker v. State*, 297 Kan. 486, 488, 303 P.3d 675 (2013); see Manning, *The Absurdity Doctrine*, 116 Harv. L. Rev. 2387, 2394 (2003) ("The absurdity doctrine rests on the intuition that some such outcomes are so unthinkable that . . . courts may safely presume that legislators did not foresee those particular results and that, if they had, they could and would have revised the legislation to avoid such absurd results.").

The problem with this version of the LCC's best argument is that it is not obvious why this court should rewrite HCR 5025 in the LCC's preferred manner—by avoiding the problematic language entirely. Even when construing a patently absurd statute, courts still must privilege clues emanating from the text itself over post hoc claims of intent. Here, the absurdity pointed out by the LCC could just as easily be rectified by changing the citation in HCR 5025(1) from K.S.A. 48-924(b)(3) to K.S.A. 48-924(b)(4). That change may make more sense out of the textual hash. It fits with the language of the Concurrent Resolution contemplating a Legislature not in session and it would avoid the factual impossibility of the State Finance Council being unable to extend the Governor's declaration beyond May 1, 2020. See K.S.A. 48-924(b)(4) (permitting serial extensions of 30 days each).

Given this (along with the uniqueness of these proceedings), my best judgment is to hold fast to the tried and true bedrock of legal interpretation and analysis—the words on the page. This commitment both constrains judicial action in circumstances where judges are ill-suited to make rules on the fly and gives the policy-making branches of government the greatest leeway to fix problems of their own making.

One final point bears mentioning. All the parties here—along with the Attorney General—have participated in one way or another in multiple meetings surrounding the issues raised by HCR 5025. All the parties participated without objecting to—or even questioning—the LCC's power to act under HCR 5025. And at oral argument, we learned for the first time that the parties were aware of the textual problems from the very beginning.

Counsel for the LCC explained that "the issue … was identified, and so the Governor's office and the legislative leadership and even the Attorney General got together and said you know this is sort of a problem here." Counsel went on to say that the "Attorney General advised them, my understanding, that this was going to be a problem, and the Legislature and the Governor's office said 'well let's just go forward because we're dealing with extraordinary times here.'" During his rebuttal time, the Governor's counsel did not dispute this recitation of the facts.

We have no record of these facts. So we cannot know for certain what happened. But counsel's explanation has the virtue of at least making sense of the seemingly insensible. How could the LCC meet in direct and obvious contravention of HCR 5025—with the Governor's tacit approval or acquiescence—and nobody raised a hand to question the propriety of what was happening?

Without a doubt, everyone involved has been putting forth an extraordinary effort to keep Kansans safe in unprecedented times. And certainly everyone involved is a dedicated public servant with the best intentions to perform his or her duties to the best of their abilities for the benefit of us all. Nonetheless, public officials have an ongoing duty to adhere to the law. This duty doesn't evaporate in a crisis—in fact, a crisis may heighten the duty. Had someone questioned the authority of the LCC to ratify or reject Governor Kelly's executive orders under HCR 5025 at the outset—when they knew there was a

problem—we, collectively, may not have been placed in the immensely difficult position of litigating the lawfulness of EO 20-18 in the few days just before Easter.

And finally, it is worth emphasizing a point clarified at the outset of the majority opinion. Today's decision does not decide the religious liberty dimensions of this dispute. All the parties, including the legislative parties, agreed that those arguments and claims are not properly before this court in this action, and must wait to another day for resolution.

**REPORTER'S NOTE:** This opinion is subject to revisions due to the accelerated timeline for the hearing and disposition of this case.