IN THE SUPREME COURT OF THE STATE OF KANSAS

No. 129,788

GOVERNOR LAURA KELLY,
in Her Official Capacity,
*Petitioner,*

v.

KRIS KOBACH, ATTORNEY GENERAL,
in His Official Capacity,
*Respondent*.

SYLLABUS BY THE COURT

The Kansas Supreme Court has original discretionary jurisdiction in quo warranto actions to hear challenges to the legal authority of a public official who has engaged in a purportedly unlawful action. The exercise of discretionary jurisdiction may be appropriate when a case presents issues of significant public concern or matters of statewide importance; the petition presents purely legal questions rather than requiring extensive factfinding; or there is a need for an expeditious ruling.

Original action in quo warranto. Oral argument held January 16, 2026. Opinion filed March 27, 2026. Petition dismissed.

*Stephen R. McAllister*, of Dentons US LLP, of Kansas City, Missouri, argued the cause*,* and *Justin H. Whitten,* chief counsel, Office of the Governor, *Ashley Stites-Hubbard*, deputy chief counsel, and *Emily Depew*, associate counsel, of the same office, were with him on the brief for petitioner.

*Kris W. Kobach,* attorney general, argued the cause*,* and *Anthony J. Powell*, solicitor general, *Dwight R. Carswell*, deputy solicitor general, and *Adam T. Steinhilber*, assistant solicitor general, were with him on the brief for respondent.

1

*Brant M. Laue*, of Topeka, *Steve Karrer*, general counsel, Kansas Department of Insurance, *Philip R. Michael*, assistant general counsel, and *Jack Clayton Johnson*, assistant commissioner, of the same department; *Jeffrey A. Chanay*, assistant state treasurer and general counsel, Office of the Kansas State Treasurer; and *Clayton Barker*, deputy secretary of state and general counsel, Office of the Kansas Secretary of State, were on the brief for amicus curiae Kansas Commissioner of Insurance joined by Kansas Secretary of State and Kansas State Treasurer.

*Edward D. Greim*, of Graves Garrett Greim, LLC, of Kansas City, Missouri, and *Matthew Mueller*, of the same firm, were on the brief for amicus curiae Legislative Coordinating Council.

The opinion of the court was delivered by

STEGALL, J.: Governor Laura Kelly brings this quo warranto action alleging that Attorney General Kris Kobach has exceeded his constitutional authority. The Governor claims that in so doing, the Attorney General has interfered with the constitutional authority of her office. The Governor's allegations arise out of a disagreement between the two executive branch officials concerning control over executive branch litigation. But the specific legal challenges the Governor brings (and the relief she seeks) have changed over the course of this action—morphing from important and far-reaching constitutional claims requiring prompt resolution into claims that simply do not support our exercise of jurisdiction in quo warranto. Because we decline to exercise our discretionary quo warranto jurisdiction over the dispute remaining before us, we dismiss the Governor's petition.

To explain how we reach this conclusion, we start at the beginning—with the two related and underlying disputes between Kansas and the federal government. First, the federal government has asked Kansas (and other states) to provide personally identifying information of Supplemental Nutrition Assistance Program (SNAP) recipients claiming

such information is necessary to root out fraud—"the SNAP Data Dispute." Second, and similarly, the federal government has attempted to delay, cut, or terminate certain federal grant funding, including SNAP, to several state agencies—"the Funding Dispute."

Broadly speaking, the parties disagree over how to respond to the federal government's actions in these matters. The Governor argues the federal government's demands and reprisals are unlawful. The Attorney General believes her position lacks any legal merit and, regardless, that she is not the real party in interest to challenge the federal government's actions in court.

Both parties have expressed their concerns to this court regarding the potential consequences of the other's course of action. In this opinion we expressly take no position on this disagreement. But, the two officials' opposing postures with respect to the federal government have now blossomed into a dispute over the scope of executive authority between these two offices. Put succinctly, the Governor's quo warranto petition asked, at least originally: if Kansas or its executive agencies are going to get involved in a legal fight with the federal government, which executive officer will control the course of that litigation?

*Discretionary Jurisdiction over Quo Warranto Actions*

When a petitioner seeks to challenge the legal authority of a public official to engage in a challenged action, they may file a quo warranto petition with this court. A quo warranto action demands that "an individual or corporation show by what authority it has engaged in a challenged action." *Kelly v. Legislative Coordinating Council*, 311 Kan. 339, 344, 460 P.3d 832 (2020) (citing *State ex rel. Schmidt v. City of Wichita*, 303 Kan. 650, 656, 367 P.3d 282 [2016]). The right to bring a quo warranto challenge is codified in K.S.A. 60-1202(1), which provides an action in quo warranto may be brought in the Supreme Court "[w]hen any person shall usurp, intrude into or unlawfully hold or

3

exercise any public office, or shall claim any franchise within this state, or any office in any corporation created by authority of this state." And K.S.A. 60-1202(5) allows such an action "[f]or any other cause for which a remedy might have been heretofore obtained by writ of quo warranto at common law." See *Kelly*, 311 Kan. at 344-45.

The Kansas Supreme Court has original jurisdiction in quo warranto actions. "Our original jurisdiction is discretionary and concurrent with that of lower courts." *Schwab v. Klapper*, 315 Kan. 150, 151-52, 505 P.3d 345 (2022) (citing *Ambrosier v. Brownback*, 304 Kan. 907, 909, 375 P.3d 1007 [2016]). See also *Kelly*, 311 Kan. at 344 ("Relief in quo warranto is discretionary."). The decision whether to exercise discretionary jurisdiction is a separate and distinct inquiry from whether a petition states a valid claim of relief. See *Schwab*, 315 Kan. at 154 ("A court may choose to exercise its discretionary jurisdiction in an original action only to conclude—as a matter of law—that the specific petition before it does not lie in mandamus or quo warranto.").

Determining whether to exercise this discretionary jurisdiction is our first duty when considering a quo warranto petition. 315 Kan. at 152.

> "In exercising our discretion to accept jurisdiction over such claims, we consider several factors, including: whether the case presents issues of significant public concern or matters of statewide importance; whether the petition presents purely legal questions or requires extensive fact-finding; or whether there is a need for an expeditious ruling. See, e.g., *Board of Johnson County Comm'rs v. Jordan*, 303 Kan. 844, 850, 370 P.3d 1170 (2016) (great public importance and concern); *Stephens v. Van Arsdale*, 227 Kan. 676, 682, 608 P.2d 972 (1980) (speedy adjudications of questions of law; matter of statewide concern); *Mobil Oil Corp. v. McHenry*, 200 Kan. 211, 239, 436 P.2d 982 (1968) (speedy adjudication to expedite official business)." 315 Kan. at 152.

Thus, whether the issues raised are of significant public concern or statewide importance is crucial to the potential success of any quo warranto petition. *State ex rel. Schmidt v. Governor Kelly*, 309 Kan. 887, 890-91, 441 P.3d 67 (2019).

On the face of Governor Kelly's quo warranto petition, the issues she raised were purely questions of law that did appear to be matters of significant public concern and statewide importance. After all, Governor Kelly had attempted to direct the Attorney General to participate in ongoing federal litigation on behalf of Kansas, and when he refused, Governor Kelly filed suit in her official capacity. The Attorney General, in turn, asserted the exclusive authority to represent Kansas and its interests in federal litigation, and sought to have the Governor removed from certain of those lawsuits. Governor Kelly sought relief in the form of a declaration from us that the Governor has the constitutional authority to "sue, join, participate in, and litigate actions or proceedings on behalf of her office and the interests of Kansas" in court.

Based on these filings, we provisionally accepted jurisdiction to allow the parties to develop their arguments through briefing and oral argument. As we will see, that development has significantly clarified and altered the issues that are now before us. And as we explain below, we now determine the actual dispute remaining between these two public officials does not present a pressing legal question of significant public importance meriting the ongoing exercise of our discretionary jurisdiction.

*There Is No Basis for Quo Warranto Jurisdiction Related to the SNAP Data Dispute*

In June 2025, the Food and Nutrition Service (FNS) agency, published a notice proposing to create a national SNAP information database for participant and transaction data. FNS subsequently notified SNAP state agencies of the data requirements and deadlines and warned that failure to comply could trigger punitive measures under federal law. On July 30, the Secretary of Kansas Department for Children and Families (KDCF)

sent official correspondence to FNS acknowledging the request for SNAP data. However, the Secretary cited pending litigation by other states to enjoin the request in *California v. USDA*, No. 25-cv-06310 (N.D. Cal.), and the roughly 30-day deadline to produce the data, and declined to comply. After additional correspondence, FNS issued a formal warning to the Governor threatening disallowance of federal funding to Kansas if KDCF did not comply with the request to deliver SNAP enrollment data or submit a corrective action proposal within 30 days.

On September 22, the Governor and the Secretary of KDCF filed an administrative appeal, which automatically stayed the disallowance of SNAP funds to Kansas. After filing this appeal, the Governor directed the Attorney General to file for emergency injunctive relief. The Attorney General refused and wrote to Governor Kelly explaining that he would seek to prevent the Governor from taking further legal action on behalf of the State. To date, he has not done so.

Indeed, the Governor's petition failed to identify any concrete official action taken by the Attorney General with respect to the SNAP Data Dispute that would enable us to evaluate our jurisdiction over a scope-of-authority dispute under the two-step test set forth in *Schwab*. See *Schmidt*, 309 Kan. at 891 ("An action in quo warranto demands that an individual or corporation show by what authority it has engaged in a challenged *action*." [Emphasis added.]).

Quo warranto does not exist in order for this court to referee abstract or rhetorical disagreements between state officials. 309 Kan. at 890-91, 893 (explaining that quo warranto relief is appropriate only when involving a challenged *action* that is of significant public concern; noting that Kansas courts lack the constitutional power to issue advisory opinions because they would violate the separation of powers doctrine). Such political or policy disagreements are commonplace and do not warrant the extraordinary remedy of quo warranto. *State ex rel. Morrison v. Sebelius*, 285 Kan. 875,

880, 179 P.3d 366 (2008) ("Quo warranto is an extraordinary remedy . . . ."). Quo warranto jurisdiction must be grounded in some concrete official action taken which is alleged to exceed the constitutional grant of authority to that official.

No matter how vigorous a public disagreement between public officials becomes—or how insistent the communication between them is—unless the disagreement manifests in some concrete and particular action, it remains abstract and theoretical. *Schmidt*, 309 Kan. at 891 ("An action in quo warranto demands that an individual or corporation show by what authority it has engaged in a challenged *action*." [Emphasis added.]). Such disputes do not rise to the level of significant public concern justifying quo warranto jurisdiction in this court. A ruling on the constitutionality of what action the Attorney General *may* take would effectively be the kind of advisory opinion we cannot render.

One way to describe such hypothetical arguments not grounded in any concrete action is to say that they have not yet ripened into the kind of limited question quo warranto is designed to resolve. We also note that based on supplemental status reports filed with this court, the SNAP Data Dispute may be resolved given agreements reached between Governor Kelly and the federal government. If that proved to be true, the SNAP Data Dispute could also be characterized as moot. And while we do not have sufficient factual development in the record of this case to definitively declare the SNAP Data Dispute moot, whether moot or unripe, we may still simply apply our established principles to the ultimate question of whether to exercise our discretionary jurisdiction.

So, applying the factors for discretionary jurisdiction set forth in *Schwab* to the allegations and arguments raised by the Governor relating to the SNAP Data Dispute, we find that none are applicable. In doing so, we specifically highlight that the Governor has failed to identify any concrete official action taken by the Attorney General with respect to the SNAP Data Dispute. Instead, the Governor cites to the Attorney General's

7

"threatened" "response" to "take all necessary actions" to prevent the Governor from representing the State. Such arguments that are untethered to any "challenged action" are not properly the subject of a quo warranto action. We therefore decline to exercise our discretionary jurisdiction over Governor Kelly's quo warranto petition with respect to the SNAP Data Dispute.

*The Funding Dispute*

The Funding Dispute is significantly more developed than the SNAP Data Dispute, and the arguments of the parties about this dispute have traveled a twisting and bumpy path over the course of this case. As such, we explain exactly where things stand and how we got here.

Also in June 2025, Governor Kelly asked the Attorney General to join Kansas in a lawsuit that was filed by many sister states against the federal government—*New Jersey v. U.S. Office of Management and Budget*, No. 1:25-cv-11816-IT (D. Mass.) (the Massachusetts Grants Action). The Attorney General declined, asserted the sole authority to control the legal position of the State, and told the Governor that she lacked the authority to direct the Attorney General to join ongoing multi-state litigation in federal court or to initiate any litigation in federal court on behalf of the State. Governor Kelly consequently filed suit in her official capacity, joining the plaintiff states, as the Governor of the State of Kansas. In her filing in Massachusetts, she alleged harm to several executive agencies she oversees.

As an aside, we note here that from the beginning of this case—through Governor Kelly's Petition in Quo Warranto, along with her briefing—she identified the Massachusetts Grants Action. On February 27, 2026, however, her office filed a status report with this court alerting us to the existence of a second action in the United States District Court for the District of Massachusetts—*Massachusetts v. U.S. Department of*

8

*Agriculture*, No. 1:25-cv-13165-IT (D. Mass.)—in which she is a named party plaintiff and in which the Attorney General has sought, via amicus brief, to have her dismissed. Any dispute involving this second action is not properly a part of this quo warranto petition as it was not raised in any filings or mentioned during oral argument. That said, we note that the Attorney General's amicus brief in the second action is substantively identical to the amicus brief he filed in the Massachusetts Grants Action.

In response to the Governor joining the Massachusetts Grants Action, the Attorney General did take official action—he filed an amicus brief arguing that Governor Kelly should be dismissed for lack of standing. The brief contains two arguments and they are clearly stated in the conclusion:

> "Governor Kelly cannot have her cake and eat it too. Either (1) she is suing only in her role as a constitutional officer, in which case she has not pled sufficient injuries to her constitutional authority, or (2) she is attempting to sue on behalf of the State, in which case any alleged injuries are neither to her nor hers to pursue. Both roads lead to the same conclusion: she lacks the ability to bring the State of Kansas into this litigation."

The Governor filed an original Petition in Quo Warranto in this court to challenge the Attorney General's opposition to her pursuit of litigation. She explicitly requested a declaration from this court that she had the authority to litigate on behalf of Kansas and the interests of Kansas. And she asserted that the Attorney General had interfered with her authority to "engage in legal actions or participate in legal proceedings to protect the interests of Kansans."

The dispute over which state official in Kansas controls any *specific* litigated matter, while implicating questions of constitutional or statutory authority, can also be characterized as a disagreement about the legal doctrine of *standing*. Black's Law Dictionary 1700 (12th ed. 2024) (Standing is a "party's right to make a legal claim or seek judicial enforcement of a duty or right based on the party's having a sufficient interest in a

9

justiciable controversy."). In other words, where the constitutional authority to bring or defend any specific litigation exists, that party will have standing grounded firmly in the Constitution. At the most basic level, litigation is what happens when two or more parties take a dispute before a neutral arbiter—almost always a court. The parties involved possess legal interests they hope to vindicate through litigation. When a party has no legal interest at stake in a case, that party is said to be without standing. See *State v. Stoll*, 312 Kan. 726, 734, 480 P.3d 158 (2021) (defendant lacked standing because she failed to demonstrate injury to a personal interest).

Often, a party without standing is described as not being the "real party in interest." "An action must be prosecuted in the name of the real party in interest." K.S.A. 60-217(a)(1). "The real party in interest is '"the party who, by the substantive law, has the right sought to be enforced."' . . . . [O]nly the 'real party in interest,' and not merely any party who will benefit from an adjudication, has standing . . . ."). *Bank of Kansas v. Davison*, 253 Kan. 780, 783, 861 P.2d 806 (1993); see also *Torkelson v. Bank of Horton*, 208 Kan. 267, 270, 491 P.2d 954 (1971) ("the real party in interest is the one entitled to the fruits of the action"); 67A C.J.S. Parties § 20 ("A real party in interest . . . ordinarily is one who has a real, actual, material, or substantial interest in the subject matter of the action as distinguished from one who has only a nominal, formal, or technical interest in, or connection with, the action.").

Governor Kelly's petition, along with her memorandum in support, various attachments and exhibits, and all her briefing—made it clear that she believed and sought to vindicate the idea that she had ultimate control over litigation on behalf of the State, and that, should the Attorney General decline or refuse her directive to do so, she was authorized to obtain counsel and engage in litigation herself. At oral argument, however, she changed course. She conceded, for the purposes of this case, that she was not in fact the constitutional officer with standing to speak for the State in court. She admitted that role belongs to the Attorney General of Kansas.

She now claims that she is only seeking to protect her right to speak on behalf of the discrete legal interests of her constitutional office as a subdivision of the state. And she continues to insist that Attorney General Kobach's Amicus Brief has unlawfully interfered with that right. As her lawyer put it succinctly before us, "What the Governor seeks is a ruling from this court that her supreme executive authority includes the power to litigate to protect her executive interests. She's not seeking to represent the State of Kansas. That is the Attorney General's job." She then asked this court for two things: a declaration that she has the constitutional authority to litigate in her official capacity on behalf of the legal interests of her office and her agencies; and a ruling that Attorney General Kobach has stepped outside of his constitutional authority and interfered with hers by filing an amicus brief in the federal court for the District of Massachusetts that makes "legal arguments that the Governor has no authority or standing to participate in [those] proceeding[s]."

For his part, the Attorney General also made crucial concessions at oral argument that make clear he does not contest the Governor's constitutional authority to represent the legal interests of her office or of the executive agencies she oversees:

> "[The Court]: The question is, who is the client? And if the client is only the Governor in her own name, her own official capacity, and the executive agencies . . . which she has authority over by law, if those are the clients that she is seeking to represent, you wouldn't have a problem with that would you? Or maybe you would?
>
> "[Attorney General Kobach]: Actually, no I wouldn't, your honor. . . . If they're retreating to the position she still can sue on behalf of her office, then we are in 100% agreement. And that's what she's doing today. She's suing on behalf of her office."

11

The Attorney General followed this up by explaining that what he does object to is a characterization of the legal interests of the Office of Governor that is so broad it swallows the interests of Kansas as a whole—interests he believes only he, as the Attorney General, is authorized to represent in court.

These concessions and developments prove immensely consequential to the outcome of this case. In fact—at least for purposes of this case—they eliminate from our consideration the most important question this case initially presented: who speaks for the State? The Governor expressly disclaimed any effort to represent the interests of the sovereign State of Kansas in litigation and conceded that this responsibility lies with the Attorney General as the State's chief legal officer. While the constitutional underpinnings of that conclusion remain cloudy at best—they are no longer part of this case and we need not delve into them here. Likewise, Attorney General Kobach's concessions make clear what he more obliquely admitted in his amicus brief—that he agrees with the basic principle we outlined above that the Governor is empowered to litigate on behalf of the legal interests of her office and those of the executive agencies she oversees—however broad or narrow those legal interests may be.

We take pains to emphasize that today's decision neither attempts to resolve nor draws any conclusion about which official or officials in Kansas have the constitutional authority to speak for the State of Kansas in court. Similarly, we offer no opinion on how broad or narrow the legal interests of the State of Kansas or of the Office of Governor actually are. We need only accept for the limited purposes of this case the parties' concessions and draw three conclusions about their actual disagreement:

First, the parties agree that, in Kansas, the Attorney General controls litigation when the State of Kansas is the real party in interest. Second, the parties agree that, in Kansas, the Governor controls litigation when the Office of Governor or the executive agencies under the Governor's authority are the real party in interest. And finally, the

parties disagree over how broadly or narrowly to legally define these interests—that is, where to draw the line between the legal interests of the State of Kansas and the legal interests of the Office of the Governor.

*We Decline to Exercise Discretionary Jurisdiction over the Quo Warranto Claims Related to the Funding Dispute*

Having done the necessary work to get to the bottom of the parties' actual dispute, we are now in a position to reevaluate our earlier provisional decision to exercise our discretionary jurisdiction over this quo warranto petition. As we explained, one of the factors we consider when deciding if we will exercise jurisdiction over the petition is "whether the case presents issues of significant public concern or matters of statewide importance." *Schwab*, 315 Kan. 150, Syl. ¶ 1.

In today's case, we initially determined the dispute between Governor Kelly and Attorney General Kobach did in fact present issues of significant concern and statewide importance. But the initial claim for quo warranto relief has been abandoned. As the parties clarified their legal positions at oral argument, we now discern that there does not exist a true legal dispute in this case that presents a pure question of law rising to the level of significant importance or public concern. That is, Governor Kelly agrees that if the real party in interest in any litigation is the State of Kansas, the Attorney General is the constitutional officer charged with the authority and responsibility to represent the State. And on the flip side, Attorney General Kobach agrees that if the real party in interest in any litigation is the Office of the Governor—including all the executive branch agencies under the authority of the Governor—then the Governor possesses the authority and responsibility to represent those parties in court. We point out again that whether the parties' agreement on these two points correctly reflects the actual state of constitutional law in Kansas is not before us and we need not decide those questions.

13

The point is, *in the arguments made before this court*, the parties do not disagree about these two propositions. Where the parties do continue to disagree is over which of the two—the Office of the Governor or the State of Kansas—is *actually* the real party in interest in the currently pending litigation in the federal district court for Massachusetts. Having abandoned her claim to possess constitutional standing to litigate on behalf of the State of Kansas, the Governor is left to object only to the Attorney General's assertion that the interests at stake in the Massachusetts Grants Action belong to the State of Kansas rather than to the Office of the Governor. In our judgment, this portion of the Attorney General's amicus brief is a run-of-the-mill standing or real party in interest argument—the kind that gets made every day in hundreds of courts across the country. But more importantly, that question is not before us—and could not be, given that it is being litigated in another court—and almost certainly requires factual findings. As a basic matter of comity between courts, we could not purport to issue a ruling here that would bind another court of significantly different jurisdiction considering a matter that we simply have not heard and are not in a position to decide.

Given all of this, there is nothing left for us to decide, and—apart from political posturing by both parties—the issues presented no longer implicate a matter of significant public importance and instead consist of a political, legal, or semantic dispute we will not referee. For this reason, we decline to continue to exercise our discretionary jurisdiction over the Funding Dispute portion of this case.

*Conclusion*

Today's decision is a narrow one and plows no new legal ground. In sum, Governor Kelly's quo warranto action began by asserting a vitally important claim that could not be easily ignored. She claimed that she—as the Governor of Kansas—had the legal authority to speak for the State in court. But she abandoned that claim. As reframed at argument, this court has not been asked to declare anything more than Governor

14

Kelly's constitutional authority to litigate on behalf of the interests of her office and those of the executive agencies she oversees. Likewise, the Attorney General does not object to the Governor representing her office and agencies in court when they are the real party in interest. We issue no holdings about the propriety of these legal positions—it is enough for us to recognize that, given the parties' apparent agreement on the positions at issue under the Governor's reframing, the parties do not present to us any disagreement we are equipped to resolve through the extraordinary mechanism of a quo warranto action.

We decline to exercise our discretionary jurisdiction and dismiss this petition.

Petition dismissed.

LUCKERT, J., not participating.

* * *

WALSH, J., concurring:  I join the majority opinion in full, and emphasize that we take no position on the underlying merits of the parties' disagreement over whether the Governor has adequately pled injury to the interests of her office in the District of Massachusetts Grants Action. I write separately to offer an explanation—from my perspective—for the divergent conclusions we reach and the cautionary import of that disconnect.

Unfortunately, the disparity between the course taken by the majority and dissent boils down to a disagreement over what the parties' arguments are. Based on my observation of the material concessions made at oral argument, the parties appear to agree the Governor's constitutional authority includes the authority to litigate to protect the interests of her office and the interests of the state agencies she oversees. The dissent, however, does not view the record as evidencing any such agreement, and would exercise

quo warranto jurisdiction to answer questions about the scope of authority bestowed by the Kansas Constitution on these two respective officers. Specifically, the dissent would address the question whether the Governor possesses authority to litigate on behalf of executive agencies and confirm that she does. And it would conclude that the Attorney General intruded upon the Governor's constitutional authority by taking official action asserting this power exclusively for himself in a legal proceeding.

Which view is more accurate will be evidenced by the Attorney General's conduct in the pending federal action—as well as his conduct in other matters, some of which the parties have previewed for us. As the dissent accurately points out, the parties vehemently disagree on how broad the scope of the Governor's interests are, both conceptually and in the instant Massachusetts Grants Action. But it is important to acknowledge that our role as the final arbiter of the Kansas Constitution, while gravely important, does not on its own bestow upon us the authority to decide either a theoretical question or one that is before another court. And, where the parties appear to agree—rightly or wrongly—on the constitutional authority bestowed on their respective offices, we will not use our interpretive role as authority for deciding issues that are not properly before us.

Our decision today passes no judgment on the substantive issues but is instead an exercise in discretion and judicial restraint based on what we believe to be the good-faith arguments—and concessions—of both parties in the matter before us.

Should the dissent's view prove to be correct, that the Attorney General's "concessions" at oral argument are nothing but doublespeak, then I believe it is important we clarify the obvious: that our approach to the underlying substantive issues, if presented in an actual dispute and through a proper procedural vehicle, may be quite different from our approach to the reframed petition we decline to consider today.

ROSEN, C.J., joins the foregoing concurring opinion.

16

* * *

STANDRIDGE, J., dissenting:  Today a court majority declines to exercise original jurisdiction in quo warranto and dismisses the Governor's petition without resolving the constitutional dispute presented. In doing so, the majority avoids definitively answering a pressing question of significant public importance and ignores the Attorney General's repeated assertions that he possesses sole authority over all litigation involving state executive agencies. The majority's rationale for this is its determination that "the Attorney General . . . made crucial concessions at oral argument that make clear *he does not contest the Governor's constitutional authority to represent the legal interests of her office or of the executive agencies she oversees*." (Emphasis added.) *Kelly v. Kobach*, 322 Kan. ___, ___, slip op. at 11. I respectfully dissent from the majority's decision.

A more fair and complete review of the record does not support the majority's selective parsing of the transcript and legal filings. This case presents a controversy between two statewide elected officers in which one asserts exclusive control over a government function that would bar the other from exercising similar authority. Although the question before us has narrowed, the core constitutional dispute remains intact and is just as pressing as when this case began:  whether the Attorney General may claim exclusive authority over litigation affecting executive agencies in a manner that prevents the Governor from exercising the "supreme executive power" vested in her office under article 1, section 3 ("The supreme executive power of this state shall be vested in a governor, who shall be responsible for the enforcement of the laws of this state."). Our court's precedent makes clear quo warranto is the proper mechanism for resolving such disputes.

Underscoring this reality, the Attorney General continues to assert his theory of exclusive authority over litigation by executive branch agencies controlled by the

17

Governor in litigation pending in the United States District Court for the District of Massachusetts. That court recently scheduled oral argument on the defendants' motion to dismiss. Their motion specifically adopts Attorney General Kris Kobach's arguments from the amicus curiae brief he filed in that litigation, advancing the same assertions he makes here. Those claims should be decided in Kansas, not in Massachusetts.

The dispute between these two Kansas officials is neither abstract nor trivial. Our court's duty is to resolve the matter by exercising our quo warranto jurisdiction and granting Governor Kelly the relief she seeks.

RELEVANT FACTUAL AND PROCEDURAL BACKGROUND

*Federal Funding Dispute*

In the spring of 2025, the federal government terminated or threatened to terminate funding under several federal grant programs administered by state executive agencies across the country, including some within the Kansas executive branch. In response, numerous states filed lawsuits challenging those actions as unlawful.

Against this backdrop, the Governor contacted the Attorney General in April 2025 to discuss whether Kansas should join a multistate lawsuit challenging the termination of federal public-health funding affecting the Kansas Department for Aging and Disability Services and the Kansas Department for Health and Environment (KDHE). According to the Governor, the loss of this funding would eliminate approximately $20 million for housing initiatives, social services, and public health programs administered by those agencies.

The Attorney General declined to participate. In a written response, he asserted that he "retain[s] sole authority to control the legal position of the State" and warned that

18

if the Governor attempted to join the litigation independently, his office would "take whatever measures are necessary to ensure that the State's legal position and legal interests are represented."

Two months later, in June 2025, the Governor again requested the Attorney General join Kansas as a plaintiff in a separate multistate lawsuit filed in the United States District Court for the District of Massachusetts, *New Jersey v. U.S. Office of Management and Budget (OMB)*, No. 125-cv-11816-IT (D. Mass.). That action challenged the federal government's termination of various grant programs and sought to enjoin additional cancellations without congressional authorization. In support of her request, the Governor cited significant funding losses affecting several Kansas executive agencies, including KDHE and the Kansas Department of Agriculture (KDA). Alternatively, she directed the Attorney General to pursue comparable relief in the United States District Court for the District of Kansas. The Attorney General again declined. He asserted the Governor lacked authority to direct him to initiate or join federal litigation and added that ethical obligations prevented him from doing so. He later told the Legislative Coordinating Council he believed the proposed litigation lacked merit.

*Governor's participation in federal litigation*

On July 31, 2025, an amended complaint was filed in the *New Jersey v. OMB* litigation identifying the Governor of Kansas, in her official capacity, as a plaintiff. In relevant part, the complaint asserted that "[t]he Kansas Constitution vests '[t]he supreme executive power' in the Governor" and that "[t]he Governor oversees all executive agencies in Kansas" and may bring suit in her official capacity to fulfill her constitutional responsibilities. The complaint further alleged the termination of federal grants would cause substantial harm to programs administered by Kansas executive agencies, including KDHE and KDA. Specifically, the complaint listed affected state programs involving

19

agricultural supply chains for food banks, at-risk children, public health initiatives, military base projects, dam safety and flood prevention, abandoned mine reclamation, safe drinking water infrastructure, and others.

*Attorney General's amicus brief*

On August 14, 2025, the Attorney General filed an amicus brief in the District of Massachusetts in the *New Jersey v. OMB* litigation in his official capacity. In his brief, the Attorney General asserted *inter alia* that the Governor's involvement in the lawsuit violates Kansas law, that she has no authority to pursue claims on behalf of state agencies, and that she lacks standing to sue in her official capacity as Governor. He further claimed Kansas law "vest[s] the Attorney General with exclusive 'authority to manage all legal affairs of the State of Kansas'" in federal court, including authority to control litigation involving state agencies. On that basis, the Attorney General urged the federal court to dismiss the Governor's claims.

*Governor's quo warranto action*

On October 31, 2025, the Governor filed a petition in quo warranto with this court under K.S.A. 60-1201 et seq., seeking a declaration that, as the State's "supreme executive," she possesses constitutional authority relating to litigation involving Kansas and that the Attorney General lacks authority to prevent her from initiating or joining litigation she determines is necessary to protect the interests of Kansas and Kansans. The Attorney General filed a response also seeking resolution of the parties' dispute regarding executive litigation authority. This court ordered briefing and oral argument. Notably, the court's order said nothing about "provisionally" accepting jurisdiction as the majority claims. 322 Kan. at ___, slip op. at 5. It simply stated: "After considering the Petition in Quo Warranto and Response to Petition in Quo Warranto, the court schedules this case for oral argument at 9 a.m. on January 16, 2026."

At oral argument, the Governor clarified the scope of her requested relief in quo warranto, explaining that she seeks only recognition of her authority to litigate in state and federal courts in her official capacity to protect the interests of her office and the executive agencies she supervises. This narrowed the question presented but did not alter its constitutional character.

Responding directly to the Governor's modified claim for relief, the Attorney General repeatedly maintained the Governor has no authority to engage in litigation to protect the interests of state agencies, which he argues are indistinguishable from the interests of the State and so fall exclusively within his purview. In fact, the Attorney General explicitly disagreed with the characterization of his argument as adopted by today's majority.

The Attorney General asserted the Governor can only join a lawsuit in her official capacity to protect a very narrow interest in her own claim to that office; otherwise, he maintains the Governor is purporting to represent the State of Kansas and has no authority to engage in said litigation. He went as far as to suggest the Governor's avenue for seeking a broader outcome in litigation that applies to "executive interests" would be by filing an amicus brief.

> "[Attorney General]: The Governor can be certainly a party, she can be a defendant all
> day long and she is a defendant quite often and usually the Attorney General steps in
> because it's a collection of defendants and the Attorney General leads the defense.
>
> "[But] [a]s a plaintiff, she has to step forward only representing her office *and not the
> interests that she has as the chief executive of the state but her office* and we would
> heartily agree.

"And she of course, in any case, she can, as an individual, file an amicus brief. All of us can file amicus briefs.

"So she can do that *as long as she made clear it was not on behalf of Kansas or the interests of Kansas*.

"[Court]: Why can't she file a lawsuit in her official capacity as Governor over legal matters that are affecting programs that are statutorily set up to be operated by the executive branch by the Governor, by the secretaries?

. . . .

"As opposed to giving the Attorney General the ability to just decide whether that affects the legal interests of Kansans and you alone control that.

"[Attorney General]: Well, that's why I say she could certainly file an amicus brief saying as Governor, my office—

. . . .

"*Once she is representing, she steps in as a party or attempts to step in as a party, she is representing Kansas.*

"*She's litigating on behalf of Kansas.*

"*She can say 'No, no, no it's not Kansas.'*

"*It's the interests of the executive branch of Kansas but that's a distinction without a difference, your Honor.*

. . . .

22

"[Court]: Do you think that when a Governor represents that they are attempting to appear in their official capacity, that that's no different than a Governor attempting to represent the state over which they're Governor?

"[Attorney General]: *I agree with that.*

"*When the Governor says I'm here in my official capacity as Governor, she is representing the state. And that's exactly what she's doing.*

"[Court]: *And you would—would you take the same logic to a secretary, a cabinet level secretary so when a cabinet level secretary says I'm here in court in my official capacity as the secretary of KDHE, is that person also representing the state?*

"[Attorney General]: *Almost certainly.*

. . . .

"*That person is also attempting to represent the state.*

"[Court]: *So your argument, if I'm following correctly, is that the Attorney General has the constitutional and statutory authority to override or to take over that litigation.*

"[Attorney General]: *Yes.*" (Emphases added.)

The Attorney General's position at oral argument was therefore consistent with his filings before this court and his amicus curiae brief submitted in the District of Massachusetts in *New Jersey v. OMB*—that he has exclusive authority to represent the interests of state executive agencies in any litigation in federal court.

Thus, despite the majority's assertions otherwise, the record shows the parties *do not* agree on the scope of their respective litigation authority. Though narrowed, the core constitutional dispute before this court—whether the Attorney General may assert

23

exclusive authority over litigation in a manner that prevents the Governor from exercising the executive power vested in her office—remains intact.

*Federal defendants' motion to dismiss*

After the filing of the amended complaint and the Attorney General's amicus brief, the federal defendants moved to dismiss the claims asserted by the plaintiffs in that litigation. In their supporting memorandum, the defendants noted certain plaintiffs—including the Governor of Kansas—are state officials rather than states themselves and argued those officials may pursue the litigation only if they possess authority under their respective state laws. Citing to the Attorney General's amicus brief as support, the defendant's memorandum identifies the Governor as one of three state officials whose authority to litigate on behalf of their states is disputed and argues those plaintiffs should be dismissed if they lack authority under state law to bring the claims asserted. See Defendants' Memorandum of Law in Support of Motion to Dismiss at 10 n.2, *New Jersey v. U.S. Office of Management and Budget*, No. 25-cv-11816 (D. Mass. Sept. 11, 2025).

On March 12, 2026, the Governor filed a Notice of Update in this case informing us that the federal court in Massachusetts has scheduled oral argument on that motion to dismiss. The arguments supporting that motion squarely present the question whether the Governor possesses authority under Kansas law to pursue the claims she asserts in the federal litigation—an issue closely akin to the dispute presented here.

ANALYSIS

I. *Prerequisites for quo warranto review are satisfied*

Article 3, section 3 of the Kansas Constitution confers original jurisdiction on this court over quo warranto actions, which are also grounded in common law and statute.

24

This court's quo warranto jurisdiction is discretionary and concurrent with that of the lower courts. *Schwab v. Klapper*, 315 Kan. 150, 151-52, 505 P.3d 345 (2022). A common law action in quo warranto requires the respondent to show "by what authority" it has engaged in a challenged action. *State ex rel. Schmidt v. City of Wichita*, 303 Kan. 650, 656, 367 P.3d 282 (2016). K.S.A. 60-1202(1) further authorizes an action in quo warranto "[w]hen any person shall usurp, intrude into or unlawfully hold or exercise any public office, or shall claim any franchise within this state, or any office in any corporation created by authority of this state."

Recently, in *Schwab*, this court explained quo warranto actions follow a two-step framework requiring the court to determine (1) whether to exercise discretionary original jurisdiction in quo warranto, and (2) whether an action "lies" in quo warranto such that proper relief can be granted through this remedy. 315 Kan. at 152-54. Only if both questions are answered in the affirmative should the court proceed to the merits.

A. *Discretionary original jurisdiction*

In deciding whether to exercise discretionary jurisdiction over a quo warranto petition, this court considers "whether the case presents issues of significant public concern or matters of statewide importance; whether the petition presents purely legal questions or requires extensive fact-finding; or whether there is a need for an expeditious ruling." *Schwab*, 315 Kan. at 152. For the reasons stated below, I would find each of these factors warrants exercising discretionary jurisdiction over the Governor's petition and her narrowed claim for relief.

Disputes involving governmental authority implicating the State's legal interests or rights of its citizens generally qualify as matters of significant public concern and statewide importance. See, e.g., *Kelly v. Legislative Coordinating Council*, 311 Kan. 339, 344-45, 460 P.3d 832 (2020) (accepting jurisdiction in quo warranto proceeding to

25

consider council's alleged intrusion into legislative scheme overseeing Governor's emergency authority during COVID-19 pandemic); *State ex rel. Stephan v. Finney*, 251 Kan. 559, 568-69, 836 P.2d 1169 (1992) (exercising jurisdiction over Attorney General's quo warranto action challenging Governor's authority to bind state in compact with native tribe). Here, the issue of executive authority to litigate on behalf of state agencies has implications for millions of dollars to public programs and services across Kansas. Given the interests at stake, I would find the issue of executive authority to represent those agencies in litigation against the federal government is a matter of significant public concern and statewide importance.

Further, the parties agree the material facts are not in dispute and supplied this court with supporting documents attached as exhibits, which together make up the record here. See Kansas Supreme Court Rule 9.01(d) (2026 Kan. S. Ct. R. at 65) ("[T]he petition, response to an order to show cause or to a petition, and accompanying documents constitute the record" in an original action.). The issue of executive authority to represent state agencies in litigation is primarily a legal question that does not require this court to stray beyond the parties' filings and oral argument record to resolve this question.

Finally, prompt resolution would provide much-needed clarity to public officials and agencies currently engaged in disputes with the federal government that have legal consequences for the State of Kansas and its residents, as in the *New Jersey v. OMB* litigation. The immediacy and consequences of matters implicated by the merits question here fit within this court's precedent justifying an expeditious ruling. See, e.g., *Schwab*, 315 Kan. at 152-53 (finding need for speedy resolution within a three-month period before the upcoming election cycle); *Stephens v. Van Arsdale*, 227 Kan. 676, 682-83, 608 P.2d 972 (1980) (speedy adjudication warranted in mandamus proceeding to resolve questions of law for guidance of state officers); *Mobil Oil Corp. v. McHenry*, 200 Kan. 211, 239, 436 P.2d 982 (1968) (speedy adjudication warranted to expedite official

26

business). Moreover, this issue is unlikely to be resolved without an ultimate, definitive ruling by this court. Thus, I am convinced there is sufficient need for an expeditious ruling.

Although the above analysis demonstrates the traditional factors warrant this court's discretionary jurisdiction over the Governor's petition, the majority concludes this matter is no longer of "significant public importance" but rather a mere disagreement about the legal doctrine of standing with "political, legal, or semantic" implications that is not for this court to "referee." 322 Kan. at ___, slip op. at 14. Frankly, if the majority was accurately representing the parties' arguments and positions as reflected in the record, I might agree the dispute does not warrant the exercise of discretionary jurisdiction. But that is not the case. And since the majority ignores the inconvenient parts of the record, I will lay them out further.

When the court proposed an alternative theory of state government in which the subdivisions of the state can identify their own legal interests—instead of the Attorney General possessing sole authority to determine their interests—he expressly rejected this theory.

> "[Court]: A different way to resolve that conundrum might be that the legislature understood that the state is not the same thing as a subdivision of the state.
>
> "Strikes me that your argument sort of views the subdivisions like a nesting doll and the state as an entity subsumes all its subdivisions but there's a different theory of government which is, subdivisions have their own legal standing independent of the legal standing of the sovereign state.
>
> "[Attorney General]: I would say, Your Honor, typically most litigation is not constructed that way, though.
>
> . . . .

27

"It is like a nesting doll."

And when asked directly whether he agreed the Governor can represent the executive agencies she has authority over, the Attorney General did not assent to that view.

"[Court]: I thought I understood where you were and now I'm a little less certain.

"I thought at the outset you said you're fine with the Governor representing herself in her official capacity.

"You're fine with the Governor representing the executive agencies she has authority of but now it sounds like you're not.

"[Attorney General]: No, no—I don't think I said exactly that.

"I said I'm fine with her representing her office and the powers of her office."

Considering the entirety of the Attorney General's statements in their proper context, it is perplexing how the majority finds a material concession that dissolves the entire constitutional dispute before us. The most cautious reading of the record after oral argument reveals some uncertainty remains about how the Attorney General understands the scope of the Governor's litigation authority. But his statements reflect that, even if the Governor may possess some theoretical authority to litigate, he believes litigation involving state executive agencies remains under his control, leaving the Governor with only a very limited role. Yet under this restrained interpretation, the Attorney General most certainly *does not* agree the Governor may independently pursue litigation on behalf of those agencies.

28

The Attorney General's stated position at oral argument is consistent with his filings before this court and in federal court—that the Governor lacks authority to litigate on behalf of state executive agencies because the interests of those agencies are indistinguishable from the interests of the State itself and therefore fall exclusively within his authority as the State's chief legal officer. Indeed, in his amicus brief filed in the Massachusetts litigation, the Attorney General repeatedly asserts Kansas law vests him with exclusive authority to control federal litigation involving state agencies and officers, asserts that the Governor has no such authority, and urges the federal court to dismiss the Governor's claims on that basis. The Attorney General did not disavow those assertions during oral argument.

I predict it will come as quite a shock to both parties that a majority of this court concludes the dispute over their respective litigation authority was resolved at oral argument by concessions from the Attorney General. The Governor's rebuttal highlights how far off that notion is.

> "[Court]: It's your position from your briefs, anyway, is that the Attorney General is interfering with her ability to represent the interests of her office.
>
> "[Counsel]: Yes.
>
> . . . .
>
> "[Counsel]: What kind of a remedy is it to say the Governor can file an amicus brief as a private individual?
>
> "That's ridiculous, frankly.
>
> "Any of us, of course, can file an amicus brief as a private individual.
>
> . . . .

"And again, the notion that if KDHE sues or . . . the Department of Ag. sues that that is automatically the quote State of Kansas, that makes no sense.

"It's not at all consistent with the statutes authorizing those entities to sue and be sued.

. . . .

"[Counsel]: And our position is here state law authorizes the Governor to speak in litigation.

"That's all she's ultimately really trying to do and I go back to Justice Biles, I think you're right on when you characterize or at least asked is the Attorney General saying he alone gets to decide, that's exactly the position he's ultimately taken because he's saying, anything apparently is within the interest of Kansas.

"Therefore, it's the State of Kansas.

"Therefore, it's him.

"And him alone."

In sum, when the record is considered fairly, objectively, and in its entirety, the core constitutional dispute between these officials remains and is just as pressing as when the Governor filed this action. And since this constitutional dispute remains, the majority's conclusion that the case no longer presents a matter of significant public importance necessarily collapses.

Questions about the constitutional boundaries between two statewide elected officials are, by their very nature, matters of significant public concern. But the majority seeks to diminish this importance by casting it as a "run-of-the-mill standing or real party

in interest argument" better resolved in the federal litigation. 322 Kan. at ___, slip op. at 14. That mischaracterization distorts the nature of the issue.

The question before this court is not whether the Governor satisfies the requirements of Article III standing in federal court or whether she is the "real party in interest" under federal procedural rules. Rather, the question is one of Kansas constitutional law: whether the Governor possesses authority under article 1, section 3 of the Kansas Constitution to litigate in her official capacity to protect the interests of the executive branch and the agencies she supervises, or whether the Attorney General may assert exclusive control over such litigation. The answer to that question determines the allocation of constitutional authority between two statewide elected officers under Kansas law and is what both parties have asked this court to address. Federal courts routinely decide standing and real-party-in-interest questions, yet they cannot definitively resolve that question, because the meaning of the Kansas Constitution and the allocation of authority among Kansas constitutional officers are matters of Kansas law entrusted to this court. *State ex rel. Stephan v. Finney*, 254 Kan. 632, 633, 867 P.2d 1034 (1994) ("The interpretation of the constitution of the State of Kansas and the laws of Kansas by the Supreme Court of Kansas is controlling upon the federal and all Kansas courts.") (citing *Quality Oil Co. v. Du Pont & Co.*, 182 Kan. 488, 493, 322 P.2d 731 [1958]).

Nor does the existence of parallel federal litigation diminish the need for this court to resolve the issue. To the contrary, the Attorney General's amicus filing in the federal case expressly raises a question of Kansas law—whether the Governor possesses authority to litigate on behalf of executive agencies—and urges the federal court to dismiss the Governor's claims on that basis. And the federal defendants have now moved to dismiss the Governor's claims relying directly on the Attorney General's amicus brief. See Defendants' Memorandum of Law in Support of Motion to Dismiss at 10 n.2, *New Jersey v. U.S. Office of Management and Budget*, No. 25-cv-11816 (D. Mass. Sept. 11,

2025) (citing Br. of the State of Kan. as Amicus Curiae, ECF No. 78). The authority of the Governor under Kansas law to pursue the claims asserted in that litigation is therefore presently being examined in the federal proceeding itself.

But federal courts do not possess the final authority to determine the meaning of the Kansas Constitution or to definitively allocate powers among Kansas constitutional officers. Those questions are matters of Kansas law entrusted to this court. *Solomon v. State*, 303 Kan. 512, 525, 364 P.3d 536 (2015) ("The Kansas Supreme Court has the authority and duty to preserve the constitutional division of powers against disruptive intrusion by one branch of government into the sphere of a coordinate branch of government."). When litigation pending in another forum turns on the meaning of state constitutional or statutory authority, clarification from the state's highest court is not only appropriate but essential. Indeed, resolving such questions is a central function of this court. Although one way such an issue may reach this court is through a certified federal question, when the dispute properly arrives instead by a quo warranto proceeding, we may address it in that context. See *Finney*, 254 Kan. at 636 (quo warranto action resolving dispute between statewide officers over allocation of authority under Kansas law after federal court recognized interpretation of Kansas constitutional and statutory authority rests with the Kansas Supreme Court). Treating the dispute as a routine procedural matter to be resolved elsewhere ignores that the controversy arises from a fundamental disagreement about the structure of Kansas executive power. The issue is therefore not a subsidiary question of federal procedure but a threshold question of Kansas constitutional authority—one that will continue to recur unless definitively resolved by this court.

Thus, the underlying dispute here is neither hypothetical nor academic. It is presently affecting the legal posture of multiple Kansas agencies engaged in federal litigation. This court has repeatedly exercised its original jurisdiction in quo warranto to resolve conflicts between branches of government or between constitutional officers

32

because such disputes implicate the structure of Kansas government itself. See, e.g., *Legislative Coordinating Council*, 311 Kan. at 344-45; *State ex rel. Schmidt v. Kelly*, 309 Kan. 887, 441 P.3d 67 (2019); *State ex rel. Morrison v. Sebelius*, 285 Kan. 875, 179 P.3d 366 (2008); *Finney*, 251 Kan. at 568-69; *State ex rel. Stephan v. Kansas House of Representatives,* 236 Kan. 45, 687 P.2d 622 (1984).

As narrowed, this dispute presents the same type of institutional question. Determining whether the Attorney General may prevent the Governor from litigating to protect executive agencies under her supervision affects not only the two officials before us, but the future operation of the executive branch. Declining to resolve that question on the dubious basis that "the Attorney General . . . made crucial concessions at oral argument that make clear *he does not contest the Governor's constitutional authority to represent the legal interests of her office or of the executive agencies she oversees*" does not reduce its importance; it simply leaves the constitutional boundary between these offices unsettled. (Emphasis added.) 322 Kan. at ___, slip op. at 11.

B. *Whether the action lies in quo warranto*

Having concluded this court should exercise its discretionary jurisdiction, I next consider whether the Governor's claim for relief properly "lies" in quo warranto. See *Schwab*, 315 Kan. at 153-54 ("Where the relief sought is not of the kind available in an action for quo warranto . . . , the action is said not to 'lie.'"). This is a legal question, not subject to the court's discretion, and it turns on whether the petitioner challenges an unlawful intrusion into or exercise of public office or authority. See K.S.A. 60-1202(1); *Schwab*, 315 Kan. at 155 ("For quo warranto relief to lie, petitioners must allege that [respondents] are exercising unlawfully asserted authority."); 65 Am. Jur. 2d Quo Warranto §§ 14, 16 (quo warranto may be "used to determine whether a state officer or agency has improperly exercised a power or right derived from the state, or to determine

33

whether a constitutional officer is attempting to usurp power not granted by the constitution or laws" and to prevent "a continued exercise of authority unlawfully asserted").

Applying that standard here, the Governor's petition presents precisely the type of claim that lies in quo warranto. She asserts that the Attorney General is interfering with her executive power to engage in litigation in her official capacity, on behalf of her office and the executive agencies she supervises; and in doing so, he is exceeding his lawful authority by claiming he exclusively can represent those state agencies in any litigation. The Governor points to the Attorney General's amicus brief filed in the *New Jersey v. OMB* litigation, which she contends is an exercise of public office capable of being tested in quo warranto.

Because the majority takes the same myopic view of the Attorney General's amicus brief as it does of his oral argument, I quote the relevant assertions below:

- "Governor Kelly's involvement in this suit is an unlawful end-run around the Kansas Constitution, Kansas statutes, and Kansas Supreme Court precedent."

- "Rather than alleging any actual, particularized, and concrete injuries to her constitutional authority, she has invoked only grievances related to certain state agency activities."

- "Governor Kelly's executive functions do not create an implied authority to sue in federal court. Indeed, litigation involving state officers and agencies in federal court is expressly placed under the Attorney General's purview by Kansas law."

- "Because state agencies and officers who act in their official capacities are part of the State, their federal litigation falls under the Attorney General's direction."

- "Kansas law and precedent vest the Attorney General with exclusive 'authority to manage all legal affairs of the State of Kansas'—both in and out of federal court. [Citation omitted.] And this includes the authority to direct the federal litigation of state agencies and officers, like the Governor."

- "Even assuming that a constitutional injury to her office *could* entitle her to sue in her official capacity as distinct from the State itself, Governor Kelly has not alleged a sufficient injury in this suit. Rather, she has alleged general harms to state agencies, effectively (and improperly) seeking to represent the State in this Court."

- "Certainly, the Governor oversees state executive agencies such as the departments of agriculture and health and environment, *see* Kan. Const. art. 1, § 6, and the termination (like the expiration) of federal grants may disrupt or alter the work of these agencies. But this disruption does not (and cannot) rise to the level of an injury to the Governor's constitutional authority."

- "Governor Kelly's asserted injuries are really alleged harms to state agencies, not direct, concrete, and particularized harms to her constitutional authority. She has no constitutional or statutory power to pursue this suit on behalf of the State of Kansas and its agencies. And the lack of any injury to her constitutional authority—the only capacity in which she has sued and the only thing she might possibly be able to vindicate—is fatal to her standing."

In considering these statements, it is important to clarify that quo warranto does not police the correctness of a public official's legal arguments. Thus, the dispositive question is not whether the Attorney General's standing analysis is colorable, but whether, through an official act, he is interfering with the Governor's constitutional authority to

35

litigate in her official capacity to seek redress for alleged injuries to her state executive agencies. In other words, the distinction is not between correct and incorrect legal advocacy, but between permissible legal advocacy and asserted authority through an official action. A public official does not exceed lawful authority merely by urging a court to adopt a particular view, even when a favorable decision would result in the dismissal of another official's claims. Rather, quo warranto relief is available when an official claims exclusive authority over a government function that effectively would bar another official from performance of that function. It is this assumption of power and exercise of public office that places this controversy, in the context of the Federal Funding Dispute, within the traditional scope of quo warranto.

The Attorney General's amicus brief was directed towards a concrete judicial outcome—the Governor's wholesale exclusion from participation in federal litigation on the ground she lacks any authority to participate. In that filing, he asserted that the Governor's involvement violates Kansas law, she lacks authority to pursue litigation to vindicate alleged injuries to state agencies, and he alone possesses authority to represent the interests of state agencies in all federal litigation. By making these statements in federal court, the Attorney General purports to exercise what he perceives as his authority to supersede and completely foreclose the Governor's exercise of her executive functions related to litigation on behalf of state agencies. Her claim presents the type of disputed exercise of public authority that lies within the core purpose of quo warranto actions.

II. *Merits:  whether the Governor is entitled to quo warranto relief*

Having determined the Governor's challenge is properly brought in quo warranto, I turn to the merits:  whether the Governor possesses executive litigation authority to protect the agencies she supervises and, if so, whether the Attorney General exceeded his

lawful authority under the Kansas Constitution. I limit my analysis to the Federal Funding Dispute. Thus, I do not consider other actions taken, which do not rise to this level or are not documented in the record.

I begin with the constitutional framework governing the executive branch and the respective roles of its independently elected officers. Within that framework, I examine the scope of the Governor's constitutional authority, including her supervisory relationship with executive agencies, as well as the constitutional limits on the Attorney General's powers. Ultimately, I determine the Governor has inherent constitutional authority to engage in litigation to protect the executive interests of her office and the agencies she supervises. As such, I also conclude the Attorney General intrudes upon the Governor's constitutional authority by an official act asserting this power exclusively for himself in a legal proceeding.

A. *Constitutional structure of the executive branch*

The Governor and the Attorney General are independently elected constitutional officers within the executive branch, each with designated powers and duties. See Kan. Const. art. 1, § 1; *Markham v. Cornell*, 136 Kan. 884, 892-93, 18 P.2d 158 (1933) ("These officers hold their offices by the will of the people. Each one has duties, responsibilities, rights, and functions peculiar to his office. . . . Their responsibility is to the people."). Within our government scheme, the Governor is the chief executive officer primarily charged with execution of the law, and the Attorney General is considered the chief legal officer. See *State v. Finch*, 128 Kan. 665, 667, 280 P. 910 (1929). While these two executive officers share responsibility for the government's enforcement function, they have varying levels and scope of authority within this scheme as determined by our Constitution.

37

1.  *Scope of Governor's constitutional authority*

The Governor's constitutional power is notably broad. The Kansas Constitution provides that "[t]he supreme executive power of this state shall be vested in a governor, who shall be responsible for the enforcement of the laws of this state." Kan. Const. art. 1, § 3. This plain language creates a clear hierarchy within the executive branch, placing the Governor atop the executive administrative structure created to carry out the government's enforcement function. See *State v. Dawson*, 86 Kan. 180, Syl., 187, 119 P. 360 (1911) (observing Governor is the "highest in authority in the executive department"). The term "supreme" denotes being "superior to all others" and "executive power" encompasses the "enforcement" of law, defined as "[t]he act or process of compelling compliance with a law." Black's Law Dictionary 1748, 713, 667 (12th ed. 2024).

The Governor's superior executive role is further demonstrated by constitutional provisions requiring the other executive officers to report to the Governor on any subject relating to their official duties, as required. Kan. Const. art. 1, § 4. Additionally, the Constitution grants the Governor limited authority to appoint an acting Secretary of State and Attorney General when those offices are vacant or in the event of temporary disability. Kan. Const. art. 1, § 11.

As this court first held in *Dawson*, the phrase "supreme executive power" is "more than a verbal adornment of the office, and implies such power as will secure an efficient execution of the laws . . . in the manner and by the methods and within the limitations prescribed by the Constitution and statutes, enacted in harmony with that instrument." 86 Kan. at 187-88. It is also well-established that "'[w]hen [the] Constitution gives a general power, or enjoins a duty, it also gives, by implication, every particular power necessary for the exercise of the one, or the performance of the other.'" 86 Kan. at 188

(quoting *Field v. The People*, 3 Ill. [2 Scam.] 79, 83 [1839]). Thus, the Governor's express constitutional powers and duties come with all the *implied* power necessary to carry out the role and function of the office.

The Governor's express and implied powers are exercised primarily through the administrative apparatus consisting of executive agencies. While the creation of a state agency is considered a legislative function, the Constitution grants the Governor significant authority to reorganize, modify, or eliminate executive agencies as necessary for effective administration of the executive branch. See Kan. Const. art. 1, § 6 (excluding agencies and functions belonging to the legislative and judicial branches, as well as constitutionally delegated functions of state officers and boards); *Finney*, 251 Kan. at 582 (identifying creation of state agency as legislative function). The Legislature may override executive orders relating to reorganization of state agencies by majority vote or legislation, but it cannot alter the basic structure of the executive branch which places the Governor in the highest position to oversee those agencies. See Kan. Const. art. 1, § 6 (allowing Legislature to disapprove executive reorganization orders and to later amend or repeal by statute executive reorganization orders that take effect); *Dawson*, 86 Kan. at 187 ("An executive department is created, consisting of a governor and the other officers named, and he is designated as the one having the supreme executive power; that is, the highest in authority in that department.").

Relevant here, the affected agencies in the Federal Funding Dispute, KDA and KDHE, are under the Governor's sole administrative authority by statute, which aligns with the constitutional hierarchy described above. See K.S.A. 74-560(a)-(b) (establishing the Department of Agriculture within the executive branch to be administered under direction and supervision of a Secretary, who is appointed by and serves at the pleasure of the Governor); K.S.A. 75-5601(a) (establishing the Department of Health and

39

Environment within the executive branch to be administered under the direction and supervision of a Secretary, who is appointed by and serves at the pleasure of the Governor).

## 2. *Constitutional limits on Attorney General's authority*

By contrast, the Kansas Constitution enumerates only two specific grants of authority to the Attorney General: the power to seek removal of a county sheriff under article 9, section 5, and the duty to initiate redistricting validity checks under article 10, section 1. See also *State ex rel. Stephan v. Reynolds*, 234 Kan. 574, 576, 673 P.2d 1188 (1984) ("The constitution is silent as to the attorney general's powers and duties.").

Although the Kansas Constitution is largely silent on the Attorney General's general litigation authority, the Legislature has supplied statutory dimension to the office. See *Reynolds*, 234 Kan. at 576. Absent express constitutional language defining an officer's powers and duties, the Legislature may give statutory dimension to the scope of an office holder's authority, as it has done with the Attorney General. See *Morrison*, 285 Kan. at 884-85. Among other things, Kansas law directs the Attorney General to represent the State in litigation as authorized by law—including when directed by the Governor. See K.S.A. 75-108; K.S.A. 75-702. But these statutes do not empower the Attorney General as the exclusive "voice of the sovereign" in all litigation or give him the power to define the State's "interests" in all litigation, nor could they. Any statutory grant of authority must abide by the executive-branch hierarchy established by article 1.

In addition to statutes, the Attorney General relies on common law to define the scope of his authority. While this court has held the Attorney General may exercise broad common law powers as the State's chief legal officer, that authority exists within the executive structure established by the Constitution and thus remains subject to the

direction of the Governor and the Legislature. See *Finch*, 128 Kan. 665, Syl. The Attorney General is also bound by ethical obligations as an officer of the court and is limited in his conduct before the court by those professional duties. *Morrison*, 285 Kan. at 887-88.

Generally speaking, in litigation involving the State or one of its entities, the Attorney General may be called upon to represent the interests of a government client in litigation. Yet the client—including a government client—*not the attorney*, is ultimately responsible for defining the client's legal interests. Kansas Rule of Professional Conduct 1.2(a) (2026 Kan. S. Ct. R. at 328) ("lawyer shall abide by a client's decisions concerning the lawful objectives of representation").

B. *Merits Inquiry*

1. *Whether the Governor may litigate in her official capacity to protect executive branch interests, including those of supervised agencies*

The Governor contends the power to litigate is inherent in her office's constitutional powers and duties since "[a] fundamental and common way to command compliance and respect for our laws is to litigate." The Governor acknowledges Kansas law generally permits the Attorney General to represent the State's legal affairs but argues this authority cannot infringe upon her express and implied constitutional powers—especially in the context of executive agencies where she has a "special interest" by virtue of her supervisory, constitutional role as head of the executive branch. At oral argument, the Governor clarified her concern in this case, which she proposes includes the interests of the executive agencies she supervises.

Citing broad authority under common law and statutes, the Attorney General claims he exclusively controls any litigation involving executive agencies because the agencies' interests are indistinguishable from the State's interests, which he alone can determine how, when, or even *whether*, to defend or vindicate.

This court's early *Dawson* decision provides the starting point for understanding how executive-branch litigation authority must be analyzed under the Kansas Constitution. In *Dawson*, this court emphasized the Constitution's vesting of "'supreme executive power'" in the Governor is "more than a verbal adornment of the office" and carries with it the authority necessary to ensure the faithful and effective execution of the laws, exercised "within the limitations prescribed by the Constitution and statutes, enacted in harmony with that instrument." 86 Kan. at 187-88.

The Attorney General argues *Dawson* has been effectively curtailed by later precedent and does not support an implied gubernatorial litigation authority independent of statutory authorization, particularly when the Attorney General has determined litigation is unmeritorious or inconsistent with the public interest. He relies heavily on *Finch*, which he contends establishes that the Attorney General possesses broad, exclusive authority to determine Kansas' interests and to define those interests in any litigation, including litigation involving executive agencies.

Properly understood, however, *Finch* is consistent with *Dawson*'s constitutional hierarchy and does not support the Attorney General's categorical theory that he may unilaterally define the State's interests in all circumstances and thereby preclude the Governor from participation in litigation undertaken to protect executive-branch interests. *Finch* describes the Attorney General as "the chief law officer" in a controversy with a county attorney, but simultaneously and explicitly qualifies that status as being "subject only to direction of the Governor and the Legislature." 128 Kan. at 667. And *Finch*'s discussion of the Attorney General's broad common-law discretion to control the State's

litigation is framed within that same structure, including its reliance on *Dawson*'s explanation that "supreme executive power" denotes the Governor is "'the highest in authority in the executive department.'" See 128 Kan. at 667 (citing *Dawson*, 86 Kan. 180, Syl.).

Thus, while *Finch* confirms the Attorney General generally manages litigation brought "as representative of the state," it does not resolve—much less compel—a rule that the Attorney General may use that role to foreclose another independently elected constitutional executive officer from litigating in his or her official capacity to vindicate the powers and duties of his or her own office. See 128 Kan. at 668 (citing 2 Thornton on Attorneys at Law, 1131). *Finch* must be read in context as resolving a dispute about the power of the Attorney General in a disagreement with a county attorney, not with a Governor.

The Kansas Constitution vests the Governor with the "supreme executive power" and makes her responsible for the enforcement of the laws of this state. Kan. Const. art. 1, § 3. This court has recognized this provision establishes the Governor as the constitutional head of the executive branch. See *Morrison*, 285 Kan. at 907. The ability to invoke the courts to protect the lawful operation of the executive branch follows naturally from that constitutional responsibility. Litigation is a conventional means by which executive officials ensure enforcement of the law. Thus, when litigation threatens the functioning of executive agencies—and the Attorney General declines representation or advances a contrary position—the Governor must be able to pursue litigation in her official capacity to protect the interests of the executive branch she is constitutionally charged to oversee. Without that ability, the Governor could not fully discharge her constitutional duty to ensure the laws of this state are faithfully enforced.

Accordingly, consistent with the structure of the executive branch established by article 1 of the Kansas Constitution and the Governor's role as the supreme executive, I

would hold that the Governor possesses constitutional authority to engage in litigation to protect the interests of her office and the executive agencies under her administrative control.

As applied to the Federal Funding Dispute, the Governor exercised this constitutional authority by filing a complaint in federal court defending the interests of her office and executive agencies she supervises, KDHE and KDA.

## 2. *Whether the Attorney General exceeded his lawful authority*

The Attorney General, acting in his official capacity, claims he possesses exclusive authority to control all litigation involving state executive agencies and the Governor lacks authority to participate in federal litigation to vindicate alleged injuries to those agencies. He advanced this position in his amicus brief, which is now embraced by the defendants in a motion to dismiss the Governor's challenge.

A careful review of the Attorney General's amicus brief confirms his assertions cannot fairly be characterized as a routine standing argument. Although the brief invokes Article III standing doctrine as the procedural mechanism for dismissal, its reasoning rests on—and repeatedly returns to—a categorical theory of executive authority under Kansas law. The brief opens by asserting that "[o]nly the Attorney General can sue on behalf of Kansas," and proceeds to argue Kansas law vests the Attorney General with "absolute" and "exclusive" authority to direct all federal litigation involving the State, its agencies, and its officers acting in their official capacities. From that premise, the brief denies the existence of any gubernatorial authority to litigate in federal court on behalf of executive agencies, rejects the notion that the Governor may sue when the Attorney General declines to do so, and expressly disavows any "exhaustion of remedies" or fallback litigation power in the Governor.

The Attorney General's standing analysis is inseparable from his asserted allocation of power. The brief does not simply contend that the Governor failed to plead a sufficient injury in this particular case as a matter of fact; it asserts that because state agencies and officers acting officially are "part of the State," all federal litigation concerning their interests necessarily falls under the Attorney General's exclusive control. On that view, the Attorney General asserts the Governor's participation is not merely unsupported by the pleadings but is an "unlawful end-run around the Kansas Constitution" requiring dismissal. These arguments made in an official filing reflect an asserted institutional prerogative to define, in the first instance, the outer limits of the Governor's authority to litigate.

To be sure, the Attorney General occasionally acknowledges in the brief—largely in the abstract—the possibility that the Governor *might* possess some narrow authority to sue to vindicate a direct injury to her constitutional office. But he simultaneously insists such authority is unavailable here, "[n]or could she" invoke it, because any litigation implicating harm to executive agencies necessarily constitutes litigation on behalf of the State, which only the Attorney General may control. The brief's culminating formulation underscores the breadth of his position:  whether the Governor is viewed as suing solely in her official capacity or as attempting to vindicate state interests, "[b]oth roads lead to the same conclusion: she lacks the ability to bring the State of Kansas into this litigation."

In substance and effect then, the Attorney General's amicus brief asserts more than a debatable view of standing. It advances a theory of exclusive executive litigation authority that categorically precludes the Governor from participating in federal litigation whenever the claims concern the operation, funding, or legal interests of the executive agencies she supervises. By collapsing all such interests into those he deems "the sovereign State of Kansas" and claiming sole authority to litigate them, the Attorney

General would supersede and foreclose the Governor's ability to employ litigation as a tool to carry out her constitutional responsibilities to oversee and protect the functioning of the executive branch.

I would hold this assertion of exclusive executive authority purporting to exclude the Governor from litigating to protect executive-branch interests—rather than the mere advocacy of a colorable standing argument—places the Attorney General's conduct beyond the scope of his lawful authority under the Kansas Constitution.

My conclusion would not disturb this court's prior precedent on executive litigation authority. Those cases primarily addressed statutory allocations of authority between the Governor and the Attorney General, questions I do not resolve here because this case turns on constitutional limits alone. See, e.g., *State ex rel. Foster v. City of Kansas City, Kansas*, 186 Kan. 190, 194, 350 P.2d 37 (1980) (concluding Attorney General was statutorily required to appear on behalf of the State in proceedings before the Supreme Court and "the governor could have no more effect than the legislative mandate"); *Dawson*, 86 Kan. at 189-91 (concluding Governor's constitutional role and broad statutory authority to require Attorney General to assist with enforcement function *and* Attorney General's specific statutory duties in the prohibition enforcement context, allowed Governor to direct Attorney General to take legal action consistent with statutory duty).

Nor does my approach alter the independent constitutional status of the Attorney General. It recognizes only that the Governor may litigate to protect executive branch interests within her constitutional sphere, and that the Attorney General may not enlarge the scope of his authority to bar that exercise.

Finally, my position is consistent with United States Supreme Court precedent holding the State need not speak with a single voice in federal litigation. Federal courts

46

must defer to a state's internal allocation of litigation authority, even when multiple state officials advance different legal positions. *Berger v. North Carolina State Conference of the NAACP*, 597 U.S. 179, 182, 185, 192, 142 S. Ct. 2191, 213 L. Ed. 2d 517 (2022) (recognizing "divided state governments sometimes warrant participation by multiple state officials in federal court"; noting "[s]ometimes leaders in different branches of government may see the State's interests at stake in litigation differently"; and surmising it is better to "risk a hobbled litigation rather than a full and fair adversarial testing of the State's interests and arguments"). I believe Kansas' constitutional structure permits more than one state officer to participate in litigation affecting the State's governance, depending on the nature of the interests at stake and the authority asserted. Yet I express no view on the full range of circumstances in which any particular officer may litigate in the name of the State, because that question is unnecessary to resolve the dispute presented here.

CONCLUSION

I would exercise discretionary original jurisdiction in quo warranto, find the original action in quo warranto properly lies, and grant the requested relief by declaring the Governor of Kansas may, in her official capacity, litigate to protect the interests of her office and the executive agencies she supervises.

BILES, J., joins the foregoing dissenting opinion.

47